732 So.2d 276 (1999)
SIEMENS ENERGY & AUTOMATION, INC. and Zurich American Insurance Company Of Illinois, Appellants,
v.
Robert PICKENS, Appellee.
No. 98-CC-00470-COA.
Court of Appeals of Mississippi.
May 4, 1999.
*278 Forrest W. Stringfellow, Arthur S. Johnston, III, Jackson, Attorney for Appellants:.
Lance L. Stevens, Jackson, Attorney for Appellee.
BEFORE KING, P.J., BRIDGES, AND LEE, JJ.
LEE, J., for the Court:
¶ 1. On June 10, 1991, Robert Pickens was employed at Siemens Energy & Automation as a crane operator and received a work-related injury to his left leg when a chain holding a two hundred pound metal tank broke and struck the claimant. On October 8, 1993, claimant filed a "Petition To Controvert" with the Mississippi Workers' Compensation Commission against Siemens and Zurich-American Insurance Company of Illinois. On June 24, 1996, a hearing was held before an administrative judge at the Mississippi Worker's Compensation Commission. On September 24, 1996, the administrative judge ordered that the employer and carrier pay compensation benefits to the claimant as follows:
1. Permanent total disability benefits at the rate of $218.26 per week beginning June 10, 1991, and continuing thereafter for 450 weeks, with proper credit for compensation and short term disability benefits paid by defendants during this time; and
2. All medical services and supplies required by the nature of his injury and the process of his recovery as provided in § 71-3-15, excluding medical treatment rendered by Dr. Kendall Blake as a result of claimant's degenerative joint disease.
Siemens admitted the injury was compensable, but disputed the amount of compensability awarded.
¶ 2. On October 9, 1996, Siemens and Zurich-American filed a "Petition For Review" before the Full Commission from the order of the administrative judge. On October 21, 1996, Robert Pickens filed a "Cross-Appeal" before the Commission arguing that the administrative judge erred in finding that the employer/carrier was entitled to any set-off or credit for long-term disability benefits. On March 3, 1997, a hearing was held before the Full Commission, and a "Full Commission Order" was entered which affirmed the "Order of Administrative Judge" dated September 24, 1996. On April 3, 1997, Siemens and Zurich-American filed their "Notice Of Appeal To Circuit Court."
¶ 3. A hearing was held, and on February 17, 1998, a "Final Judgment" was entered. The judgment affirmed the finding of the Mississippi Workers' Compensation Commission. The circuit court held that substantial evidence was presented to support the award with regard to the Pickens's permanent and total disability and further held that the employer/carrier are not entitled to credit for time worked by Pickens after the date of his injury. It is from this decision that Siemens and Zurich-American appeal. Finding the employer/carrier's arguments without merit, we affirm.

*279 FACTS
¶ 4. In 1974, claimant was hired by Siemens Energy and Automation. On June 10, 1991, the date of injury, Pickens was working as an overhead crane operator when a chain holding a two hundred pound metal tank broke. The chain struck his left leg causing a laceration which was two inches deep and five inches long. It was stipulated by the parties that Pickens was earning an average weekly wage of $406.40 at the time of his injury.
¶ 5. At the hearing held before the administrative judge, Pickens testified that as a result of his work-related leg injury he was off work commencing June 1, 1991 through July 30, 1991. On July 30, 1991, he returned to work as a crane operator. Additionally, Pickens testified that his job as a crane operator required him to walk the length of a two-block building, that his work activities caused continued left leg pain and swelling, and that he sought medical treatment for those symptoms. Further, Pickens stated he worked as a crane operator until February 1992, when he was off of work for two or three days because of left knee and leg swelling. Pickens then resumed the duties of his employment as an overhead crane operator and worked until June 1994, when he "could not do the job anymore." Pickens further testified that he had received social security disability benefits since 1995, and that he had not made any efforts to secure other employment since 1995. Additionally, Pickens testified that he received short and longterm disability benefits beginning June 1994, under a plan offered by the employer, and that during his course of employment with Siemens he had paid for or contributed to long-term disability benefits in the amount of approximately $5.00 per pay check, per week.
¶ 6. Rodney Brooks, Siemens's personnel manager since January 1994, testified that when claimant returned to work he had not suffered a loss in wages. Additionally, Brooks testified that when Pickens filed for short-term disability benefits he was unaware that claimant had filed a petition to controvert. Brooks further testified that Pickens received short-term disability benefits for six months after which he received long-term benefits, and that employees made no contribution to the short-term disability plan; however, Pickens did contribute to the long-term disability plan. Brooks testified that employees with workers' compensation injuries were not eligible to receive benefits under the short-term or long-term disability plan, and that although the plan itself did not mention a set-off for workers' compensation benefits, it specifically excluded occupational injury and disease from coverage.
¶ 7. Pickens was treated by several physicians relative to his leg injury. Pickens was treated for the injury by general surgeon, Dr. George Shaak, and later by vascular surgeon, Dr. Seshadri Raju; neurosurgeon, Dr. Hunt Bobo, and orthopedic surgeon, Dr. Kendall Blake.
¶ 8. On June 30, 1991, Pickens was examined by general surgeon, Dr. George Shaak, at Rankin General Hospital for treatment relative to the laceration to his left leg injury. On this date, Pickens complained of left leg pain and swelling and difficulty bearing weight on his left leg attributable to a deep subcutaneous laceration to his leg on June 10, 1991. Dr. Shaak noted claimant had undergone primary closure in layers and that he had later developed a low grade infection. Dr. Shaak also noted claimant had a history of hypertension and of prior surgery to his left knee, but no history of diabetes. Dr. Shaak's impression was that Pickens's wound was slow to heal due to venous hypertension; however, he did not know the cause of the venous hypertension. Dr. Shaak prescribed bed rest with elevation and the application of Bactroban and an ACE bandage to claimant's wound.
¶ 9. The record indicates that on November 25, 1991, Dr. Shaak completed a Form B-27, Final Medical Report, which stated that Pickens had reached maximum medical improvement on July 24, 1991, and that *280 he could return to work with no permanent impairment or permanent work restrictions.
¶ 10. Additionally, the record indicates that on July 15, 1993, Dr. Shaak filed a supplemental final medical report indicating Pickens was discharged on July 12, 1993, to neurosurgeon Dr. Hunt Bobo's care. Dr. Shaak also stated Pickens had a permanent impairment which he identified as left posterior distal tibial nerve damage. Dr. Shaak also stated Pickens was capable of performing similar employment with no physical restrictions.
¶ 11. Dr. Shaak's clinic notes, dated July 12, 1993 stated that Pickens was referred to Dr. Bobo for a left distal posterior tibial nerve lesion secondary to the laceration, that claimant was still complaining of pain in his incision, and that his pain was probably related to the tibial nerve lesion. Dr. Shaak concluded claimant had reached maximum medical improvement from the skin lesion with no permanent impairment "from the physical aspects of the wound itself ... however, I cannot make any comment on the neurological portion of the wound."
¶ 12. Dr. R. Hunt Bobo, a neurosurgeon, stated in his deposition that his medical records reflected that he first treated Pickens on March 16, 1992. Dr. Bobo evaluated Pickens relative to his left leg pain and numbness which was attributed to Pickens's work-related injury on June 10, 1991. The symptoms were swelling, left worse than right but in both legs, and a dull ache in the left leg which was worse after a long day's work, and some decrease in sensation in the left shin.
¶ 13. On July 23, 1992, Dr. Bobo examined Pickens. Pickens still complained of persistent left leg pain. Additionally, Dr. Bobo noted that Pickens had significant varicose veins in both legs and edema in his shins. Dr. Bobo diagnosed Pickens's loss of sensation as peripheral neuropathy, and also attributed his venous stasis, varicose veins, as a source of his leg pain.
¶ 14. On August 24, 1992, Dr. Bobo examined Pickens. Pickens had been taking Elavil as prescribed by Dr. Bobo and his condition seemed to have improved; however, Pickens still complained that his left leg was stiff and painful. The EMG showed denervation of the left lateral gastrocnemius and flexor digitorum longus of the left leg consistent with a posterior tibial nerve lesion. At that point, Dr. Bobo felt Pickens probably did have a posterior tibial nerve lesion.
¶ 15. On February 25, 1993, Dr. Bobo stated Pickens reported increasing weakness in Pickens's left leg, and Pickens reported numbness in the left lateral foot still present with static, as well as a mild neuropathy; however, Pickens still continued to work as a crane operator at Siemens. At this visit the left knee was swollen, but no calf atrophy. Dr. Bobo's impression was that sensation was decreased in the left lateral foot, normal in the medial foot, and that these conditions would be consistent with a posterior tibial nerve lesion. On this date, Dr. Bobo opined that the tibial nerve lesion was not getting any worse and would not benefit from surgery. Dr. Bobo referred Pickens for an orthopedic evaluation and told him to use support hose.
¶ 16. On March 26, 1993, Dr. Bobo's impression was that Pickens's left posterior was stable, and based on Pickens neurological condition he gave a five percent permanent partial impairment rating to the body as a whole; however, this rating was given with the acknowledgment that Pickens was still treating with Dr. Raju. Additionally, Dr. Bobo gave Pickens a five percent permanent partial impairment rating to his left leg relative to the work-related left distal posterior tibial nerve lesion and injury.
¶ 17. On January 21, 1994, Dr. Bobo reported that Pickens was wearing the hose on a routine basis. After further investigation, Pickens admitted to having low back pain and radiation of this pain to his legs; however, the primary pain still *281 existed in his left knee. Dr. Bobo thought the left knee was the main active source of pain, as well as varicosities being a source of pain, but that the nerve injury was an "old static problem not of current interest." Dr. Bobo ordered an MRI scan of the lumbar spine to try and reach a final conclusion as how to treat Pickens when the problems did not seem to arise from a neurosurgical illness. Additionally, he referred Pickens back to Dr. Blake for evaluation of the left knee.
¶ 18. The MRI scan was performed on February 21, 1994, and Dr. Bobo interpreted the scan. Dr. Bobo interpreted the scan to indicate that Pickens had a lateral L4-5 herniated disc with stenosis of the foramen with no fat being present, consistent with an L-4 nerve compression. Dr. Bobo diagnosed that this was causing a mild L-4 radiculopathy compression and pain form the L-4 nerve root on the left, but felt Pickens might get better with conservative treatment. Dr. Bobo recommended claimant undergo knee surgery before receiving further back treatment in order to determine how the leg pain responded to the knee surgery.
¶ 19. On April 7, 1995, Dr. Bobo examined Pickens and found that Pickens's complaints were remarkably similar. This visit occurred post-knee surgery which was performed by Dr. Blake. Dr. Bobo noted that Pickens had calf and leg swelling. Additionally, Dr. Bobo noted that knee and ankle jerks were two plus and symmetric, which was significant since there was not any major root damage to the L-4 nerve root. Furthermore, Pickens's left calf was swollen, shiny, and had two plus pitting edema and mild varices. It was Dr. Bobo's impression that at that point the pain Pickens was experiencing was not related to his lumbar spine and that the L4-5 herniated disc was asymptomatic. Dr. Bobo referred Pickens to Dr. Seshadri Raju for treatment of his venous stasis. This was the last visit Dr. Bobo had with Pickens. Since Dr. Bobo had referred Pickens to Dr. Blake for treatment with his left knee he deferred to his opinion regarding the relationship between claimant's work-connected injury and his knee problems.
¶ 20. The affidavit and medical records of the orthopedic surgeon, Dr. Kendall Blake, show he first saw Pickens on March 4, 1993, for complaints of left knee pain. Pickens stated that approximately ten years prior he had undergone what Dr. Blake thought might have been an open medial meniscetomy and had done well until an object fell across his left lower leg in 1991. Pickens stated he had experienced left leg pain since his injury in 1991, and that he had more recently noted a painful effusion in the left knee associated with popping. Pickens also had occasional feelings of instability. Dr. Blake diagnosed Pickens's condition as degenerative joint disease in both knees, more severe and symptomatic on the left. Dr. Blake injected Pickens's left knee with Marcaine and Celestone. Additionally, he advised Pickens to lose weight and attempt employment which would allow him to pursue a more sedentary routine. Dr. Blake concluded that if Pickens would work at a sedentary capacity "it would be greatly to his advantage."
¶ 21. Pickens's next visit with Dr. Blake is dated February 3, 1994. On this date, Pickens was complaining of persistent left knee pain and swelling, especially with weight bearing. Pickens reported that his current level of symptoms dated back to a work-related injury which occurred on June 1, 1991. Although Dr. Blake noted that "[t]his was not documented on his March 4, 1993, note." Dr. Blake diagnosed degenerative joint disease in claimant's left knee, symptomatic, and mild x-ray evidence of degenerative joint disease in his right knee, asymptomatic. Dr. Blake recommended an arthroscopic debridement of the left knee.
¶ 22. Dr. Blake's record contained a letter dated April 6, 1994, which was addressed to employer and carrier's counsel. Dr. Blake stated in the letter that "none of *282 this patient's knee complaints are the result of a recent injury, and that instead are solely the result of an unrelated, pre-existing, progressive problem of degenerative joint disease."
¶ 23. On November 3, 1995, general and vascular surgeon Dr. Seshadri Raju testified by deposition that he first examined Pickens on April 19, 1995, on referral from Dr. Bobo for complaints of left leg swelling and pain since 1991, when his leg was traumatized by a falling tank at work. Pickens provided Dr. Raju with a history which included left knee surgery, varicose veins, high blood pressure, and thyroid problems. Upon examination, Dr. Raju discovered that Pickens had no pulses in his foot on the left side. Dr. Raju classified Pickens in a functional class of four. Class four meant that Pickens could do household activities but nothing beyond those tasks. Dr. Raju went on to state that there was a severe functional limitation and that from a clinical viewpoint, the symptoms and signs were highly suggestive of moderate to moderately severe venous problems, as well as possible arterial problems.
¶ 24. Dr. Raju ordered several blood tests to confirm or deny the status of a venous disease, and all of the tests were within normal limits. In addition to the tests performed for venous disease, Dr. Raju ordered that venograms and venous pressure studies be performed on Pickens. Dr. Raju gave Pickens a 70 percent impairment rating to his left leg. Dr. Raju also concluded that the health problems Pickens was experiencing were either attributable solely to his work-related injury in 1991, or the work-related injury was a contributing factor in aggravating a venous condition that might have pre-existed.
¶ 25. On July 17, 1995, Pickens attended an appointment with Dr. Raju. Dr. Raju testified in his deposition that Pickens's symptoms at that time were vague, and he did not recommend surgery for his condition. However, Dr. Raju felt that Pickens could no longer perform at a job that required standing up or heavy manual labor; however, he could sit down and "weave baskets if he could make a living doing that."
¶ 26. Dr. Raju testified that the fact that Pickens returned to work for three years after his injury would not change his opinion of his diagnosis. Dr. Raju stated that Pickens had "fairly severe venous hypertension on venous pressure studies," and regardless of whether Pickens worked there, there was objective evidence of a fairly severe venous disease. Dr. Raju noted that Pickens's ability to work between August 1991 and June 1994 was compatible with venous problems because "venous problems in general, are not, as I said, limb threatening or life threatening. They are indolent and they can build up over a period of time, so it is not unusual for pain to become unbearable over a period of time because it is cumulative."

DISCUSSION

I. STANDARD OF REVIEW
¶ 27. The standard of review utilized by this Court when considering an appeal of a decision of the Workers' Compensation Commission is well settled. The Mississippi Supreme Court has stated that "[t]he findings and order of the Workers' Compensation Commission are binding on this Court so long as they are `supported by substantial evidence.'" Vance v. Twin River Homes, Inc., 641 So.2d 1176, 1180 (Miss.1994) (quoting Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss.1988)). An appellate court is bound even though the evidence would convince that court otherwise if it were instead the ultimate fact finder. Barnes v. Jones Lumber Co., 637 So.2d 867, 869 (Miss.1994). That employer might convince us that this is a doubtful case avails it nothing, for we have repeatedly stated that such doubts should be resolved in favor of a finding of compensability to the end that the beneficent purposes of the Worker's Compensation Act may be carried out. Barham v. *283 Klumb Forest Products Center, Inc., 453 So.2d 1300, 1303-04 (Miss.1984); Holman v. Standard Oil Co. of Kentucky, 242 Miss. 657, 667, 136 So.2d 591, 594 (1962). This Court will reverse only where a Commission order is clearly erroneous and contrary to the weight of the credible evidence. Vance, 641 So.2d at 1180; see also Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 12 (Miss.1994). "This Court will overturn a Commission decision only for an error of law, or an unsupportable finding of fact." Georgia Pacific Corp. v. Taplin, 586 So.2d 823, 826 (Miss.1991) (citations omitted). Therefore, this Court will not overturn a Commission decision unless it finds that the Commission's decision was arbitrary and capricious. Id.; see also Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1247 (Miss. 1991) (stating that where the court finds credible evidence supporting a Commission decision, it cannot interfere with that decision any more than with a case from any other administrative body). This Court believes that the administrative judge and the Full Commission correctly applied the law. This Court does not believe that the administrative judge or the Full Commission abused their discretion in the fact finding process. Thus, we uphold their decisions.

II. ANALYSIS OF ISSUES PRESENTED

I. WHETHER THE COMMISSION COMMITTED AN ERROR OF LAW IN AWARDING PERMANENT TOTAL BENEFITS TO THE CLAIMANT SINCE THE CLAIMANT FAILED TO SEEK EMPLOYMENT AFTER QUITTING WORK WITH THE EMPLOYER IN JUNE OF 1994, OR IN THE ALTERNATIVE, WHETHER THE RECORD IS DEVOID OF SUBSTANTIAL EVIDENCE TO SUPPORT SUCH AN AWARD.
¶ 28. Mississippi statutory law states that in workers' compensation matters, an injury means "accidental injury or accidental death arising out of and in the course of employment without regard to fault which results from an untoward event or events, if contributed to or aggravated or accelerated by the employment in a significant manner." Miss.Code Ann. § 71-3-3(b) (Rev.1995). The Mississippi Supreme Court has held that the claimant has the burden of proving by a "fair preponderance of the evidence" the following elements: "(1) an accidental injury, (2) arising out of and in the course of employment, and (3) a causal connection between the injury and the death or claimed disability." Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 13 (Miss.1994) (citations omitted). The court stated further that "once the claimant makes out a prima facie case of disability, the burden shifts to the employer." Id. (citations omitted).
¶ 29. In the present case, it is uncontested that the claimant was injured while at work, but this litigation turns, among other things, on the topic of whether the claimant should receive permanent total disability benefits. Dunn states:
[A] partial loss of functional use may result in total disability, and to reach this result it is not necessary that the employee be wholly incapacitated to perform any duty incident to his usual employment or business; but if he is prevented by his injury from doing the substantial acts required of him in his usual occupation, or if his resulting condition is such that common care and prudence require that he cease work, he is totally disabled within the statute.
V. Dunn, Mississippi Workmen's Compensation, § 86 at 102-03 (3d ed.1982) (quoted in McGowan, 586 So.2d at 166; Piggly Wiggly v. Houston, 464 So.2d 510, 512 (Miss.1985)).
¶ 30. To establish disability, the injured employee bears the burden of showing that he has sought and been unable to obtain work "in similar or other jobs." Georgia Pacific v. Taplin, 586 So.2d 823, 828 (Miss.1991). The law is *284 clear that once the claimant has made a prima facie case, the burden shifts to the employer to show that his efforts were not reasonable or constituted a mere sham. Id.; Pontotoc Wire Products Co. v. Ferguson, 384 So.2d 601, 603 (Miss.1980). A determination of the "reasonableness" of the claimant's efforts (in seeking employment) includes "consideration of job availability and economics in the community, the claimant's skills and background, as well as the subject of disability itself." Taplin, 586 So.2d at 828. When this Court reviews the complete record and the medical evidence presented within the record in light of the factors listed in Taplin, it finds that the burden to prove "reasonableness" in seeking employment has shifted to the employer.
¶ 31. By his own testimony, Pickens admitted that he had not made inquiries with potential employers relative to obtaining employment; however, the testimony shows that Pickens returned to work at Siemens after his injury. In fact, Pickens was employed with Siemens for an additional three more years after his injury. Pickens worked until his left leg would no longer allow him to perform the functions required in his position as a crane operator. Pickens had informed supervisors at Siemens that he was having problems with his left leg, and Siemens was never forthcoming in offering Pickens a sedentary job. This might be because Pickens only had a sixth or seventh grade education and admittedly had difficulty with both reading and writing. Pickens had always held a manual labor position. Additionally, medical evidence established that Pickens had a permanent medical impairment which had resulted in a loss of wage-earning capacity. Due to his medical condition, Pickens has not been able to return to work since June 1994.
¶ 32. Dr. Raju testified in his deposition that Pickens had a seventy percent permanent impairment rating to his left leg, and he did not recommend surgery for his condition. However, Dr. Raju felt that Pickens could no longer perform at a job that required standing up or heavy manual labor; however, "he could sit down and weave baskets if he could make a living doing that." The deposition testimony of Dr. Raju establishes that due to his work-related, health condition Pickens was no longer able to work in a "similar" manual labor job.
¶ 33. The administrative law judge's order made findings of fact to the effect that the claimant's efforts at securing employment did not involve reasonable diligence. "What constitutes a reasonable effort is not easy to determine. It is ... a factual question which depends upon a variety of factors...." Dunn, Mississippi Workers' Compensation, § 72.1 at 85 (3d ed.1983). While the claimant may not have filled out application forms, he was unable to be employed in similar or other employment. The administrative law judge correctly applied the law, and we are bound by the judge's ruling unless there is an abuse of discretion. Therefore, the Commission's order should be upheld as the "substantial weight of the evidence" test has not been rebutted.
¶ 34. The record indicates that the administrative judge considered several factors in determining that Pickens was entitled to permanent total disability. The administrative judge considered that Pickens was an individual fifty-nine years of age with a sixth or seventh grade education. Pickens testified that his ability to read and write were limited. Pickens attempted to work for approximately three years after his leg injury and only ceased working at Siemens because his leg would not allow him to continue the manual labor position. Additionally, Pickens testified that he had always worked in a manual labor position. The testimony of Dr. Raju established that Pickens current condition was work-related and that he no longer needed to perform work in a manual labor position. In his deposition, Dr. Raju limited Pickens ability to stand and also felt that due to his venous condition even sitting *285 might be a problem and Pickens might be required to lie down during these activities. Furthermore, the administrative judge considered the fact that Pickens resided in Lexington, Mississippi. Pickens also testified that he had been receiving social security disability benefits since 1995. All of the aforementioned factors established that Pickens was entitled to permanent total disability.
II. WHETHER CLAIMANT MET HIS BURDEN OF PROOF WITH REGARD TO CAUSATION OF HIS VENOUS PROBLEM.
AND
III. WHETHER THE COMMISSION'S DECISION TO AFFIRM THE ORDER OF THE ADMINISTRATIVE JUDGE IS SUPPORTED BY SUBSTANTIAL EVIDENCE DUE TO THE COMMISSION'S RELIANCE ON THE TESTIMONY OF DR. RAJU AND DUE TO HIS FAILURE TO FURNISH THE EMPLOYER AND THE COMMISSION A REPORT OF HIS TREATMENT IN VIOLATION OF MISS. CODE ANN. § 71-3-15(1).
¶ 35. The Commission is the trier of facts, as well as the judge of credibility of the witnesses, and the findings of fact supported by substantial evidence should be affirmed by the circuit court. Roberts v. Junior Food Mart, 308 So.2d 232, 234 (Miss.1975). The Commission affirmed the administrative law judge's findings in the case sub judice after viewing the evidence submitted by Pickens's attending physicians, Drs. Shaak, Bobo, Blake and Raju. Based on the testimony of Dr. Blake and Raju, the administrative law judge held as follows:
Pickens had a five percent permanent impairment to his left leg attributable to the posterior tibial nerve injury which resulted from the work-connected injury on June 10, 1991. Dr. Raju assessed a seventy percent permanent medical impairment to claimant's left leg attributable to the venous problems which were either caused or contributed to by the work-connected injury on June 10, 1991.
Although claimant also experienced a worsening of his pre-existing knee condition after June 10, 1991, injury, Dr. Blake related the symptoms for which he treated claimant to pre-existing degenerative joint disease. Dr. Blake performed a debridement procedure on an outpatient basis because of this condition, but there is no evidence that claimant has a permanent impairment or work restrictions as a result of his knee condition.
The administrative judge therefore concluded that Pickens had established by a preponderance of the medical evidence that claimant's work-connected injury on June 10, 1991, either caused or significantly contributed to his venous condition but that it did not cause or significantly contribute to the degenerative joint disease in his left knee. Dr. Raju placed physical restrictions on Pickens due to his venous condition.
¶ 36. The employer/carrier argues that Dr. Raju's opinion is less than substantial and credible, and that the administrative judge and Commission should not have awarded permanent disability based on his opinion. The employer/carrier bases this argument on the two points: (1) Pickens did not inform Raju that he had worked for Siemens commencing July 1, 1991 through June of 1994, and (2) Dr. Raju had no knowledge of a history of venous problems in the left leg prior to the date of the injury. There is no proof in the record that suggests that Dr. Raju's testimony was false, inaccurate, or made with ill will.
¶ 37. In South Central Bell Telephone Co. v. Aden, 474 So.2d 584, 591 (Miss. 1985), the employer/carrier asserted an argument similar to that in the case at bar. In Aden, the employer argued that a doctor's testimony was not credible because he had given his opinion regarding the work connectedness of the injury on the assumption that claimant had stopped *286 working on May 12, 1978, the day of the accident, when in fact claimant had continued to work for three more days. Id. The record reflects that employer/carrier never asked the doctor whether the fact that the claimant had worked for three days after the accident would change his opinion. Id. Additionally, the employer never offered an explanation as to why claimant's working for three days would be inconsistent with the doctor's and the Commission's finding of permanent total disability, particularly in view of claimant's own and by no means incredible testimony that while trying to work for the next three days she was experiencing increasingly severe pain in her back. Id. at 591-92.
¶ 38. Unlike Aden, in the case at bar, counsel for the employer/carrier did pose the question of whether a return to employment would effect Dr. Raju's diagnosis and opinion as to the causal link between the work injury to his left leg in 1991 and his current venous condition. Dr. Raju asserted that regardless of his work history, Pickens current venous condition was either a result of the 1991 injury or was a contributing factor to his venous condition. Dr. Raju also testified that regardless of whether the venous condition existed prior to Pickens's left leg injury in 1991, the leg injury if not the proximate cause of the venous condition was a contributing factor to aggravating the condition.
¶ 39. The case at bar is similar to Aden in that the employer/carrier failed to assert why a return to work would be inconsistent with Dr. Raju's and the Commission's findings of permanent total disability, and similarly, Pickens testimony can be found to be credible because he attempted to work for three years after his injury and notified supervisors of the symptoms and pain he was experiencing. Testimony revealed that prior to the accident Pickens had never complained of left leg problems.
¶ 40. Dr. Raju is a general, vascular, and cardiothoracic surgeon, and his testimony was determined to be credible by the administrative judge relative to the opinions he held pertaining to the 1991 leg injury either causing or aggravating a severe venous condition in Pickens's left leg. Dr. Raju had several office visits with Pickens which he examined Pickens left leg and ordered numerous tests. Dr. Raju's findings are not required to be precise, complete and unequivocal. South Central Bell Telephone Co. v. Aden, 474 So.2d 584, 591 (Miss.1985). If doubt exists regarding the sufficiency of this medical evidence, the benefit of those doubts goes to the claimant consistent with the liberal interpretation of the act. Id. at 590.
¶ 41. This Court will reverse an order of the Workers' Compensation Commission only where such order is clearly erroneous and contrary to the overwhelming weight of the evidence. Myles v. Rockwell Int'l, 445 So.2d 528, 536 (Miss.1983). With the parameters of the aforementioned standard having been observed in resolving this issue raised by the claimant, we will not go behind the fact finding body, "even though that evidence would not convince us were we the fact finders." South Central Bell Telephone Co. v. Aden, 474 So.2d 584, 589-90 (Miss.1985).
¶ 42. As an alternative argument, Siemens asserts that Dr. Raju's failure to file his medical reports with either the employer/carrier or the Mississippi Workers' Compensation Commission barred Pickens from asserting that the 1991 left leg injury was the cause of his current venous condition. Siemens cited a portion of Miss.Code Ann. § 71-3-15(1)(Rev.1995), which states, as follows:
No claim for medical or surgical treatment shall be valid and enforceable, as against [the] employer, unless within twenty (20) days following the first treatment, the physician or provider giving such treatment shall furnish to the employer, if self-insured, or its carrier, a preliminary report of such injury and treatment on a form or in a format approved by the Commission. Subsequent *287 reports of such injury and treatment must be submitted as least every thirty (30) days thereafter until such time as a final report shall have been made. Reports which are required to be filed hereunder shall be furnished by the medical provider to the employer and carrier receiving such reports to properly furnish copies the Commission. The Commission, may, in its discretion, excuse the failure to furnish such reports within the time prescribed herein if it finds good cause to do so, and may, upon request of any party in interest, order or direct the employer or carrier to pay the reasonable value of medical services rendered to the employee. (emphasis added).
¶ 43. "Ordinarily, the enforcement of time limits for the filing of pleadings, briefs and other papers is a matter committed exclusively to the court in which the filings are required. To be sure, substantial adherence to time limitations and filing deadlines are required for a fair and orderly dispatch of a court's business. On the other hand, the granting of leniency or dispensation in the event of tardiness is a matter committed to the sound discretion of the court wherein the filings are made. Except where the time deadline may be said to be jurisdictional or unless there has been a gross abuse of discretion on the part of the particular court, we will not look behind an inferior court's determination that its filing deadlines should be relaxed in a given instance." Aden at 594.
¶ 44. The Mississippi Supreme Court has made an analogy and noted that the Court has many rules imposing time limitations and filing deadlinesfor the perfection of an appeal, for the filing of briefs, for the filing of petitions for rehearing. The Mississippi Supreme Court retains the authority in exceptional cases and when it is necessary to prevent manifest injustice to relax deadlines. Clark v. City of Pascagoula, 473 So.2d 477, 478 (Miss. 1985).
¶ 45. The filing deadline on which the employer/carrier centers its argument is in no sense jurisdictional. Jurisdiction and discretion have clearly been conferred upon the Mississippi Workers' Compensation Commission to excuse the failure of a physician to furnish reports within the time prescribed. Pickens should not be prejudiced by his physicians failure to furnish the proper paperwork. It is also worth noting that the employer/carrier's argument is in error because Miss.Code Ann. § 71-3-15 goes to compensation of work related injuries and not establishing the causation.
¶ 46. Siemens further argues that the record is devoid of proof that the Commission excused the failure and, since the Commission did not excuse such, the venous claim should have never been allowed. The very fact that the administrative judge's order determined that a preponderance of the medical evidence substantiated that claimant's work-connected injury on June 10, 1991, either caused or significantly contributed to his venous condition which Dr. Raju stated rendered Pickens with a seventy percent permanent impairment rating to his left leg, on its face, establishes that the administrative judge had excused Dr. Raju's failure to file a medical report. Furthermore, the administrative judge held that Pickens was entitled to all medical services and supplies required by his injury; however, the judge specifically excluded Dr. Blake Kendall which leaves the rational inference that Dr. Raju was included in those physicians to be paid by the employer/carrier relative to his work-related injury.

IV. WHETHER THE COMMISSION'S DECISION TO AFFIRM THE ORDER OF THE ADMINISTRATIVE JUDGE IS ERRONEOUS BECAUSE IT FAILS TO ALLOW THE EMPLOYER AND CARRIER CREDIT FOR WAGES EARNED BY THE CLAIMANT AFTER JUNE 10, 1991.
*288 ¶ 47. Siemens argues that the administrative judge committed error when the judge held that it was not entitled to credit for wages earned by the claimant after June 10, 1991. The Mississippi Supreme Court addressed the issue of proper credit for wages earned by a claimant in Sturgis v. International Paper, 525 So.2d 813, 814 (Miss.1988). "The authoritative statute which grants the employer credit states: If the employer has made advance payments of compensation, he shall be entitled to be reimbursed out of any unpaid installment or installments of compensation due." Miss.Code Ann. § 71-3-37(11) (Rev.1995) (emphasis added). Compensation is defined as "the money allowance payable to an injured worker or his dependents provided in this chapter...." Miss.Code Ann. § 71-3-3(j) (Rev.1995).
¶ 48. In Sturgis v. International Paper, the court further elaborated on this position and provided an example. "[T]he amount of the credit is not the amount of the wages paid, but the amount of compensation due for the particular week. Thus, if the wage paid was $200, and if the compensation due for the week was $150, the credit is for $150 only. In other words, the credit is for the week, not for a number of dollars, and the excess cannot be carried over as a credit against other weeks of liability." Sturgis, 525 So.2d at 814 (Miss.1988) (citation omitted).
¶ 49. As stated by Justice Robertson in South Central Bell Telephone Co. v. Aden, 474 So.2d 584, 596 (Miss.1985): "[O]ne of the major features of the compensation act is that which provides for a steady though modest stream of income to the disabled worker." In Aden, South Central Bell was likewise denied credit in excess of the compensation payable to the injured worker. "The rule is that credit is allowed where the payment of wages is intended to be in lieu of compensation." City of Kosciusko v. Graham, 419 So.2d 1005, 1009 (Miss.1982). In the case at bar, Pickens did not receive what has been defined as compensation, but merely received those wages which he worked for and was rightly entitled. The employer is not entitled credit for "earned wages"; therefore, the Commission was not in error in disallowing the credit to Siemens.

V. WHETHER THE COMMISSION'S DECISION AFFIRMING THE ORDER OF THE ADMINISTRATIVE JUDGE IS ERRONEOUS IN THAT IT FAILED TO ALLOW THE EMPLOYER AND CARRIER CREDIT FOR LONG TERM DISABILITY PAYMENTS MADE BY THE EMPLOYER TO PICKENS.
¶ 50. Siemens argues the Commission's decision to affirm the administrative judge was in error. The administrative judge allowed credit for the short-term disability benefits paid pursuant to the employer's disability plan "credit is not allowed for long-term disability benefits because claimant contributed to the payment of these benefits and they thereby represent an earned benefit to his employment." Rodney Brooks testified that Pickens contributed approximately five dollars of his pay check, per week to the long-term disability program which equals about forty-five percent of an hourly wage per week.
¶ 51. Counsel for employer/carrier cites Western Electric, Inc. v. Ferguson, 371 So.2d 864 (Miss.1979), to support its argument that credit for long-term disability payments should have been allowed. Ferguson is distinguishable from the case at bar. In Ferguson, when the court allowed a credit for the employer's payment of disability benefits it was because the employees did not contribute to the pension plans. Id. at 868. The Mississippi Supreme Court noted that the purpose of the pension plan was to provide a continuity of income to the employee or his dependents in the event of disability or death. Additionally, the court commended an employer who willingly supplied disability and pension programs to its employees and that employers should be commended and encouraged rather than penalized. If an employer makes a payment voluntarily it *289 should be permitted to claim the benefits of those payments. If the court refused credit it would only urge employers to be less generous. Id. With this in mind, the administrative judge's order and the Commission's upholding the same is consistent with Ferguson. The administrative judge allowed credit to the employer for the short-term disability benefits which were paid solely by the employer; however, consistent with the general logic of Ferguson, the judge did not allow credit for long-term benefits because Pickens had contributed earned wages to the long-term disability program.
¶ 52. THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS AFFIRMED. STATUTORY DAMAGES AND INTERESTS ARE AWARDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, COLEMAN, DIAZ, IRVING, PAYNE, AND THOMAS, JJ., CONCUR.