930 So.2d 428 (2005)
MUELLER COPPER TUBE COMPANY, INC. and The Travelers Insurance Company, Appellants
v.
Stanley W. UPTON, Appellee.
No. 2004-WC-01493-COA.
Court of Appeals of Mississippi.
November 1, 2005.
Rehearing Denied February 21, 2006.
Certiorari Denied June 1, 2006.
*431 David B. McLaurin, Tupelo, James Gregory Brown, attorneys for appellants.
Duncan L. Lott, Booneville, attorney for appellee.
EN BANC.
CHANDLER, J., for the Court.
¶ 1. Stanley Upton was an employee for Mueller Copper Tube Company. After he sustained a work-related ankle injury and underwent surgery, he returned to Mueller and attempted to work in job capacities that were less physically demanding. However, each of the four jobs he performed after the surgery caused him to have back problems. Upton's treating physician took him off work and opined that Upton had reached maximum medical improvement. Upton applied for other jobs but was unable to find employment.
¶ 2. Mueller Copper Tube Company admitted that the injury to the ankle was compensable, but it denied that Upton sustained any work-related back injuries and denied that Upton was permanently or totally disabled. The administrative law judge held a hearing and found that Upton was permanently and totally disabled. The Workers' Compensation Commission and Itawamba County Circuit Court affirmed. Mueller appeals, raising the following issues:
WHETHER UPTON IS ABLE TO RELY ON A PRESUMPTION OF PERMANENT DISABILITY WHEN UPTON FAILED TO REPORT TO WORK
WHETHER THE COMMISSION ERRED IN AWARDING BENEFITS BECAUSE UPTON FAILED TO MAKE A REASONABLE OR DILIGENT JOB SEARCH ATTEMPT
WHETHER THE WORKERS' COMPENSATION ERRED IN GIVING THE OPINIONS OF DR. CHRISTOPHER MORE WEIGHT THAN THOSE OF DR. TYRER AND DR. MITIAS
WHETHER THE WORKERS' COMPENSATION COMMISSION'S DETERMINATION OF PERMANENT AND TOTAL DISABILITY TO UPTON'S BACK WAS BASED UPON SUBSTANTIAL EVIDENCE
¶ 3. Finding no error, we affirm.

FACTS
¶ 4. Stanley Upton attended school through the ninth grade and had worked for Mueller Copper Tube Company, Incorporated ("Mueller"), since 1987. Prior to working at Mueller, Upton worked in several manual labor, unskilled jobs. These jobs included that of a lumber stacker, press operator, painter, carpenter, and plumber. Upton's responsibilities at Mueller were to pick up coils of pipe weighing approximately eighty-seven pounds, place the coils in a box, and seal the box. The performance of those duties required Upton to bend, stoop, pivot on his feet, and walk. On January 29, 1997, Upton sustained an injury to his ankle during the course and scope of his employment. Upton's surgery and much of his follow-up treatment was performed by Dr. Robert Christopher, an orthopedic surgeon. After Dr. Christopher told Upton that he had *432 reached maximum medical improvement, Upton filed for workers' compensation benefits. Mueller admitted that Upton had a compensable workers' compensation claim, but it denied that Upton was permanently disabled. Upton filed his motion to controvert on August 7, 1998.
¶ 5. When Upton returned to work at Mueller after his surgery, he attempted to work at other jobs within the company. Upton testified that he had problems with his ankle and back while performing all of these jobs. His first job with Mueller after his surgery involved scrapping paint and sorting parts. His second job involved packing coils. This job lasted for about a month. Upton's third job involved tying coils, a job that required bending, twisting, and throwing thirty-pound coils over his head. This job lasted for approximately one week. Upton's final job with Mueller was sweeping floors, which lasted for approximately three weeks.
¶ 6. After leaving his job with Mueller, Upton was unable to obtain other employment. He sought light-duty work with three prospective employers in Itawamba County, but no such positions were available. The three prospective employers were B & B Metal Manufactures, which makes bushhogs; TCA, a packing company; and Mid-American Hardwood Company. Upton also contacted Key Staff Source, a temp agency, which was unable to find a job for Upton due to his limitations and restrictions.
¶ 7. Dr. Christopher's records showed that Upton visited his office thirty-four times between February 7, 1997 and March 1, 1999. Dr. Christopher examined Upton on February 7, 1997, and diagnosed his condition as a ruptured Achilles tendon in his left ankle. On February 11, 1997, Dr. Christopher performed the surgery, finding that the tendon was completely torn off the bone.
¶ 8. On June 6, 1997, Dr. Christopher allowed Upton to begin working at light duty for four hours a day. On June 13, 1997, Dr. Christopher took him off work because Upton's job duties made his ankle hurt. On July 7, 1997, Dr. Christopher allowed Upton to resume working. Dr. Christopher's notes revealed that Upton's Achilles tendon was aggravated whenever Upton increased his work activity.
¶ 9. On June 15, 1998, Dr. Christopher concluded that Upton had reached maximum medical improvement and was assigned an impairment rating of twenty percent to the foot, which converted to an eight percent rating for the entire body. Dr. Christopher described the ratings as "very conservative" and concluded that it was "more than likely [that] in the future the actual numbers will increase as his post traumatic arthritis increases."
¶ 10. On September 30, 1998, Upton complained to Dr. Christopher about his back, which Dr. Christopher said was related to Upton's antalgic gait as a result of his ruptured achilles tendon. He also believed that the pushing and pulling involved in Upton's job activity aggravated Upton's back and caused muscle spasms. Since that time, ninety-five percent of Dr. Christopher's treatment of Upton was for his back.
¶ 11. On January 18, 1999, Dr. Christopher told Upton that he could work at Mueller as a chopper because that job caused the least aggravation to his back. He recommended that Upton take a ten-minute break every hour to reduce the pressure to his ankle and back.
¶ 12. On May 5, 1999, Dr. Christopher referred Upton for physical therapy for his back and took him off work. Since that time, Dr. Christopher never released Upton to return to work. Two months later an MRI to Upton's back revealed a very *433 large bulging disc with neural foramina encroachment and spinal stenosis. Dr. Christopher referred Upton to Dr. Walter Eckman, a neurosurgeon. Dr. Eckman did not recommend surgery for Upton's back but did recommend physical therapy.
¶ 13. On July 2, 2001, Dr. Christopher gave Upton a maximum medical improvement. Upton was assigned a twenty percent impairment rating to the lower left extremity, which translated to an eight percent rating to the body as a whole. Upton was not allowed to work because of muscle spasms.
¶ 14. Dr. Roy Tyrer saw Upton on July 19, 2001, for the purpose of conducting a Commission-appointed independent medical examination. Dr. Tyrer testified through his deposition taken on October 16, 2001, that Upton's gait or walk was essentially normal. Dr. Tyrer stated that Dr. Christopher's opinion that Upton's back pain originated from the ankle injury involved speculation and that he would not have rationalized it to the degree to which Dr. Christopher had. Dr. Tyrer also testified that he would not place much restriction on Upton's physical activity because there was no premise upon which to base it.
¶ 15. Dr. Tyrer also testified that Upton was exaggerating his symptoms with grunts and groans and was not exerting full maximum effort during his examination. Dr. Tyrer was of the opinion that Upton's back pain was due to the changes that occur as a person gets older. Dr. Tyrer testified that he believed that Upton could work, but he should limit his lifting to thirty-five to fifty pounds, with no repetitive stooping, turning, or bending. Dr. Tyrer agreed with Dr. Christopher's impairment rating assigned to Upton's ankle and further opined that permanent physical impairment to Upton's back would not exceed an additional two percent.
¶ 16. Dr. Johnny Mitias saw Upton on June 27, 2002, for purposes of conducting an independent medical examination, at the request of Mueller. Dr. Mitias performed a Waddell's test, which is designed to detect whether a patient exaggerates symptoms. Upton tested positive for symptom magnification in all five of the tests administered to him. Dr. Mitias testified that he could not find anything on Upton's MRI that would indicate a back injury. Dr. Mitias said that Upton could walk in a straight line and do some lifting of objects that weighed less than twenty pounds, and that there could be a job at Mueller that might fit within those restrictions.
¶ 17. Don Killough, a vocational rehabilitation expert, performed a vocational evaluation on Upton on January 8, 2001. Killough administered an achievement test, which showed that Upton scored below the third grade level in reading, spelling, and arithmetic. In addition, Killough testified that Upton had no transferable work skills and that Upton's age would make training for any job difficult. Killough also opined that Upton was not qualified to work as a cashier because that type of employment required ninth grade reading and math skills.
¶ 18. In addition to offering live testimony, Killough submitted a vocational evaluation report. He classified Upton's pre-injury job as unskilled work in the medium range of physical demands, and he classified Upton's employment prior to working at Mueller as unskilled work in the heavy range of physical demands. Killough opined that Upton could not return to Mueller in any capacity. To ascertain Upton's potential to perform other types of work, Killough administered the Slosson's Intelligence Scale, on which Upton received an I.Q. score which indicated that *434 Upton was in the borderline range of intellectual functioning.
¶ 19. Mueller hired Sam Cox as a vocational expert. Cox conducted a survey of jobs in Upton's geographical area and identified five employment opportunities that fit within Upton's vocational profile. Cox was of the opinion that Upton was employable. Cox evaluated Upton based on the work restrictions provided by Dr. Tyrer, which indicated that Upton had lifting limitations of thirty-five to fifty pounds and could not engage in repetitive stooping or bending. Cox had reviewed Dr. Christopher's medical records but not his depositions. Cox was not aware until the hearing that Dr. Christopher had opined that Upton could not return to his pre-injury job.
¶ 20. Cox made no attempt to evaluate Upton's intelligence or reading or math abilities. Instead, Cox based his opinion of Upton's job skills on Upton's statement that he had completed the ninth grade. Cox did acknowledge that intelligence directly affected one's ability to perform jobs that required skill. Cox identified five potential employers for Upton: Chevron One Stop in Tupelo, hiring cashiers; Amerihost Inn in Tupelo, hiring desk clerks; Snelling Personnel in Tupelo, hiring technical machine operators; Ablest Staffing Service in Tupelo, hiring industrial workers who perform light-duty manual labor; and Key Staff Source in Tupelo, hiring industrial workers, painters and plumbers.
¶ 21. Upton's wife, Donna, verified that Upton was in constant pain with his back and leg, which required him to elevate his leg to prevent swelling. Donna verified that she took her husband to Key Staff Source and filled out the applications for him. She also testified that Upton is unable to perform any household chores.
¶ 22. On October 10, 2002, the administrative law judge found that Upton was permanently and totally disabled.[1]
¶ 23. The judge discounted Cox's testimony that Upton was qualified to work, because Cox was unaware of Upton's reading and arithmetic skills and his borderline intellectual functioning. The judge found that Upton's back injury was related to his work. In doing so, he relied on Dr. Christopher's medical opinions and discounted the opinions of Dr. Tyrer and Dr. Mitias because each of those doctors evaluated Upton only once.
¶ 24. Following a hearing on December 15, 2003, the Workers' Compensation Commission affirmed the decision of the administrative law judge. The Commission chose not to expound on the findings of the administrative law judge, affirming his findings in all respects. Mueller appealed to the Itawamba County Circuit Court, which affirmed the Commission.

ANALYSIS
¶ 25. The Mississippi Workers' Compensation Commission is the ultimate fact-finder. Vance v. Twin River Homes, Inc., 641 So.2d 1176, 1180 (Miss.1994). Where, as here, the Commission adopts the findings of the administrative law judge without presenting its own findings of fact, this Court will examine the findings of fact made by the administrative law judge. McDowell v. Smith, 856 So.2d 581, 585 (¶ 10) (Miss.Ct.App.2003); Tommy Brooks Oil v. Leach, 722 So.2d 708, 711 (¶ 10) (Miss.Ct.App.1998). This Court will affirm where substantial credible evidence supports the Commission's decision. Smith v. Jackson Const. Co., 607 So.2d 1119, 1124 (Miss.1992).
¶ 26. A worker who receives a permanent functional impairment is guaranteed *435 some measure of compensation. Miss.Code Ann. § 71-3-17(c) (Rev.2000). The ankle is included as a scheduled member. Id. The measure of compensation in a scheduled member case depends on two factors: (1) the degree of functional loss of use as demonstrated by the medical evidence, usually expressed as a percentage, and (2) the impact the loss of function has on the worker's ability to perform the normal and customary duties associated with his usual employment. Smith, 607 So.2d 1119 at 1128; General Elec. Co. v. McKinnon, 507 So.2d 363, 365 (Miss.1987). The first aspect of disability determination is known as functional disability, and the second aspect of disability determination is known as industrial disability. Robinson v. Packard Elec. Div., General Motors Corp., 523 So.2d 329, 331 (Miss.1988). The permanently injured worker is entitled to compensation based on the greater of the percentage of functional disability or the percentage of industrial disability. Smith, 607 So.2d at 1127; Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1247-48 (Miss. 1991).

WHETHER UPTON IS ABLE TO RELY ON A PRESUMPTION OF PERMANENT DISABILITY WHEN UPTON FAILED TO REPORT TO WORK
¶ 27. Where the claimant wishes to prove total occupational loss, the claimant bears the burden of proving that he has sought and has been unable to find work "in the same or other employment." Jordan v. Hercules, Inc., 600 So.2d 179, 183 (Miss.1992) (quoting Miss.Code Ann. § 71-3-3(I) (Rev.2000)). The Mississippi Supreme Court has held that when a claimant, having reached maximum medical improvement, "reports back to his employer to work, and the employer refuses to reinstate or rehire him, then it is prima facie [evidence] that the claimant met his burden of disability." Id. Upton never reported back to work at Mueller after Dr. Christopher assigned maximum medical improvement on July 2, 2001. Mueller relies on Jordan to argue that there is a requirement that a claimant must report back to his employer in order to enjoy the presumption of permanent disability. Jordan is factually different from this case.
¶ 28. Mueller does not contest that Upton is unable to perform the job he held before his surgery to the ankle, and it also admits that Upton is unable to stand up for extended periods of time. Nevertheless, it claims that there are other jobs at Mueller that Upton could have performed. However, the evidence shows that Upton worked at Mueller in four separate job capacities after the ankle surgery, and each job caused him to be in severe pain. Mueller offered no testimony showing what jobs could be performed by Mueller. In fact, Upton testified that he was told by a Mueller supervisor that the plant had no jobs for which he was qualified that he could perform sitting down. The evidence shows that Mueller had no job for Upton.
¶ 29. The proof is undisputed that Dr. Christopher did not release Upton to return to work when he assigned maximum medical improvement on July 2, 2001. Dr. Christopher specifically stated that Upton was not allowed to work because of recurrent muscle spasms. Upton attempted to perform lighter-duty work after his ankle surgery but could not perform any of the tasks assigned to him. Under these facts, this Court is unable to allow an employer to invoke a presumption that a claimant is able to work when the claimant fails to report to work.

WHETHER THE COMMISSION ERRED IN AWARDING BENEFITS BECAUSE UPTON FAILED TO MAKE A REASONABLE OR DILIGENT JOB SEARCH ATTEMPT
¶ 30. The Workers' Compensation Commission awarded total disability *436 benefits to Upton based on Upton's work-related injuries to his ankle as well as his back. Injury to the back is not specifically scheduled by statute. If the injury a claimant suffers is not specifically scheduled by the workers' compensation statute, the claimant's disability is measured by a loss of wage-earning capacity. Georgia Pacific Corp. v. Taplin, 586 So.2d 823, 828 (Miss.1991). To establish a loss of wage-earning capacity, the injured worker bears the burden of showing that he has sought and has been unable to work in similar and other jobs. Id.
¶ 31. When the claimant has made a prima facie case that he was unable to find other employment, the burden shifts to the employer to show that the efforts were not reasonable or constituted a mere sham. Id. A determination of the reasonableness of the claimant's efforts includes "consideration of job availability and economics in the community, the claimant's skills and background, as well as the subject disability itself." Id. A prima facie case may be overcome by affirmative evidence that other jobs existed in the relevant job market for which the claimant was at least facially qualified and that the claimant made no legitimate efforts to pursue any such employment. McCray v. Key Constructors, Inc., 803 So.2d 1199, 1201 (¶ 11) (Miss.Ct.App.2000) (citing Hale v. Ruleville Health Care Center, 687 So.2d 1221, 1227 (Miss.1997)).
¶ 32. In the present case, Mueller claims that Upton failed to make a reasonable effort to find other employment. After Dr. Christopher placed him at maximum medical improvement on July 2, 2001, Upton applied for work at three places in Itawamba County near his residence, all on the same day, November 26, 2001. One week before the hearing, Upton applied for jobs at Key Staff Sources. At the hearing, Mueller's vocational expert identified five immediate potential employment opportunities that fit within Upton's vocational profile. Mueller argues that such evidence proves that Upton's job-seeking efforts were a sham.
¶ 33. Mueller's argument that Upton failed to make a diligent search for other employment is premised on the fact that Upton was released to resume employment on July 2, 2001. However, the record shows that Upton was never released to return to work on that date. Upton nevertheless applied for work at three businesses, and applied at Key Staff Sources but received no response. Mueller's own expert admitted that he was unaware of Upton's low intellectual functioning and that Upton would not be qualified for many of the jobs identified at the hearing in light of Upton's limited intelligence. The administrative law judge and the Workers' Compensation Commission were presented with substantial evidence that Upton performed a diligent job search, and the evidence of Upton's vocational limitations as recognized by Killough and Cox demonstrated that there were no other jobs for Upton to pursue.

WHETHER THE WORKERS' COMPENSATION ERRED IN GIVING THE OPINIONS OF DR. CHRISTOPHER MORE WEIGHT THAN THOSE OF DR. TYRER AND DR. MITIAS
¶ 34. Dr. Christopher treated Upton from February of 1997 to September of 2001, a period of four and a half years. Dr. Tyrer and Dr. Mitias both evaluated Upton one time. Nevertheless, Mueller argues that the opinions of Drs. Tyrer and Mitias should be given greater weight because of the doctors' statements that Dr. Christopher's medical opinions involved speculations. In addition, Dr. Tyrer and Dr. Mitias performed diagnostic tests that refuted Upton's claims of a back *437 injury, and Dr. Tyrer and Dr. Mitias concurred with each other.
¶ 35. The administrative law judge recognized that Dr. Christopher's medical opinions contradicted the medical opinions of the other doctors. He resolved the conflict and assigned greater weight by noting that Dr. Christopher was Upton's regular treating physician. The Workers' Compensation Commission is entitled to favor the testimony of a treating physician over a physician who had seen the claimant only once. South Central Bell Telephone Co. v. Aden, 474 So.2d 584, 593 (Miss.1985).
¶ 36. Mueller argues that Aden is inapplicable to this case because Dr. Tyrer and Dr. Mitias performed diagnostic tests that indicated that Upton was being untruthful about his back injury. Mueller claims that Dr. Christopher's opinions should be discounted and not be considered substantial evidence that Upton suffered a back injury because Dr. Christopher failed to perform these diagnostic tests. This argument ignores the fact that Dr. Christopher was able to observe first-hand Upton's progressively worsening Achilles tendon and back condition that occurred over a four and a half year period. Dr. Christopher testified that Upton was having muscle spasms every time Upton came into his office.

WHETHER THE WORKERS' COMPENSATION COMMISSION'S DETERMINATION OF PERMANENT AND TOTAL DISABILITY TO UPTON'S BACK WAS BASED UPON SUBSTANTIAL EVIDENCE
¶ 37. Mueller claims that Upton failed to prove that his back injuries were related to his work-related injury to his ankle. Upton presented his proof through Dr. Christopher's depositions. Dr. Christopher was asked how much of Upton's back pain was traumatic and how much was non-traumatic. He stated:
That is the big question. . . . By looking at the history and when you look at the earlier notes he doesn't say a lot about his back, but everything was about his tendon. However when Upton got back on his feet and started to walk with weight on his ankle and weight on his foot, and he stressed the Achilles and he was going back to work, he started complaining of his back pain.
¶ 38. In Dr. Christopher's March 23, 1999 deposition, he specifically and unequivocally connected Upton's back problem to his injured ankle. He referred to a Toronto, Canada research report on problems people have with injured extremities. According to the report, when a person walks slightly unbalanced over time the body does not adjust and the person will have muscular spasms on the side of his back. By contrast, neither Dr. Tyrer nor Dr. Mitias addressed how Upton's back pain originated. Although Mueller is correct that Dr. Christopher could not state with complete certainty that Upton's back injury was related to his ankle injury, medical opinions do not have to be precise, complete, or unequivocal. Siemens Energy & Automation, Inc. v. Pickens, 732 So.2d 276, 286 (¶ 40). If any doubt exists regarding the sufficiency of medical evidence, the benefit of the doubt goes to the claimant. Id.
¶ 39. THE JUDGMENT OF THE CIRCUIT COURT OF ITAWAMBA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., BRIDGES, IRVING, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.
NOTES
[1] Upton was forty-nine years old at the time of the hearing.