755 So.2d 573 (2000)
CITY OF LAUREL and Mississippi Municipal Workers' Compensation Group, Appellants,
v.
David A. BLACKLEDGE, Appellee.
City of Laurel and Mississippi Municipal Workers' Compensation Group, Appellants,
v.
David A. Blackledge, Appellee.
Nos. 98-CC-00446-COA, 96-CC-01299-COA.
Court of Appeals of Mississippi.
February 22, 2000.
*574 Diane V. Pradat, Jackson, Attorney for Appellants.
William Harold Odom, Laurel, Attorney for Appellee.
EN BANC.

MODIFIED OPINION ON MOTION FOR REHEARING
SOUTHWICK, P.J., for the Court:
¶ 1. As a result of a motion for rehearing, the previous opinion of this court is withdrawn and the following is substituted. We agree that since there was no cross-appeal, our reversal of the apportionment was procedurally inappropriate.
¶ 2. The claimant David Blackledge was a firefighter for the City of Laurel. He was awarded temporary and permanent partial disability worker's compensation benefits due to an injury to his cardiovascular system while responding to a fire alarm. The Commission apportioned the benefits based on a pre-existing, non-workrelated heart disease. With various procedural delays along the way, the question of whether adequate evidence existed to support the award has been presented to us. We affirm except as to a $25 per month temporary benefit.

FACTS
¶ 3. David Blackledge is a forty-six-year-old former firefighter for the City of Laurel. As a firefighter, he generally worked *575 five twenty-four-hour days, followed by seven consecutive days off. He testified that he worked on average fifty-two hours a week. He supplemented his income by working as a general contractor during the twenty-one days in a month he was not working as a firefighter.
¶ 4. At the time of his injury, Blackledge had worked for the fire department for approximately twenty-two years and had advanced to the rank of lieutenant. His average weekly wage was $398.91. His job involved driving a truck to the scene of a fire, as well as ensuring that all personnel were properly attired in full protective clothing. His own fire suit weighed fifty-six pounds. He often had to exert energy in climbing fire ladders and using pick axes and chain saws in assisting his crew in fighting fires. According to Blackledge's testimony, this was a stressful job.
¶ 5. On January 1, 1991, Blackledge started his shift at 6:00 A.M. Thereafter, he responded to a fire. After he returned from that call, the fire alarm sounded again. While putting on his gear in the engine room, he passed out. After regaining consciousness, Blackledge experienced severe chest pains. An ambulance transported him to the South Central Regional Medical Center. Blackledge was examined and was told that he had pulled a diaphragm muscle and was discharged with instructions to take muscle relaxants. When he continued to suffer from severe chest pains, he consulted his family physician, Dr. James Waites.
¶ 6. Dr. James Waites first examined Blackledge on January 7, 1991. He referred him to a cardiologist, who determined that Blackledge had coronary artery disease. A heart catheterization was performed on January 9, 1991. Dr. Thad Waites, a cardiologist practicing in Hattiesburg, performed a balloon angioplasty at that time. The catheterization revealed that Blackledge's left anterior descending coronary artery was ninety percent blocked, but that was reduced to ten percent by the angioplasty. According to Dr. Thad Waites, maximum medical improvement was achieved several days after the angioplasty.
¶ 7. Four months later, in May 1991, Blackledge began to experience shortness of breath and chest pain. In June he was promoted to first lieutenant. He received an increase in pay, but the promotion was for a six-month probationary period. On August 21, 1991, Dr. Thad Waites performed a repeat catheterization with a second angioplasty. This surgery reduced blockage in the same left anterior descending coronary artery from seventy-five percent to ten percent.
¶ 8. Blackledge received full pay from the city during his recovery from the second procedure, after which he returned to work. In November 1991, he was promoted to captain, a rank which carried another six-month probationary period. In January 1992, Dr. Thad Waites performed a third catheterization on Blackledge, which showed more blockage of the same artery. However, Dr. Waites testified that he chose to defer another angioplasty.
¶ 9. Blackledge received a promotion to training officer on December 2, 1992. He testified that this position paid more per hour than he made as a captain. However, he also stated that he made less money as a training officer than he did as a captain ($63.86 less per month) because he worked fewer hours and was not paid for overtime or holidays as a training officer. He said he accepted this position for its lower stress level. On October 4, 1993, Blackledge underwent a fourth catheterization, which revealed a forty to fifty percent blockage.
¶ 10. In December 1993, Blackledge was examined by Dr. Steven Webster, a boardcertified internist and cardiologist, who determined that he had an unusual arrhythmia. Dr. Webster confirmed the diagnosis of coronary artery disease in the left anterior descending artery, saying it was related to an obstruction of the artery generated through various risk factors. *576 The obstruction was deemed to be primarily an accumulation of scar tissue, cellular reaction or cholesterol remnants that had accumulated in the lining of the artery. Dr. Webster stated that he could not relate Blackledge's arrythmia or a collapsed lung to the coronary artery disease.
¶ 11. Blackledge retired from the fire department on May 4, 1994. He continued to have problems with his heart. Dr. James Waites testified that he was totally disabled from angina. Soon after Blackledge retired, he saw Dr. Webster again, who found his condition to be unchanged. In December 1994, Blackledge was hospitalized with chest pains. Dr. Webster concluded that Blackledge's ailments were not related to his employment.
¶ 12. Dr. Thad Waites testified that most people with a ninety-percent blockage such as Blackledge at the time of his collapse at the fire station, would have had significant blockage months before that time. In addition, Dr. Waites suggested that Blackledge's family historyhis father dying of a myocardial infarction at age 51 and his mother having angioplasty at age 60constituted a strong risk factor for the development of coronary artery disease.
¶ 13. After a petition to controvert was filed with the Workers' Compensation Commission, a hearing was held. On August 24, 1995, the administrative judge ruled that Blackledge had suffered a temporary total disability at a rate of $218.26 per week for those occasional periods that he was off work with his work-connected coronary condition between January 1, 1991, and May 3, 1994. Furthermore, the order stated that Blackledge was entitled to receive $25 per week because he was temporarily partially disabled from December 1, 1992(the date he became a training officer) until May 3, 1994(the date he last worked for the fire department). The administrative judge determined that Blackledge was entitled to permanent partial disability benefits at a rate of $106.37 per week for 450 weeks beginning May 4, 1994, as well as paid medical services. Finally, a ten-percent penalty was authorized for unpaid installments of compensation.
¶ 14. The employer and carrier appealed the order. The Commission affirmed on March 25, 1996. Various delays, motions to dismiss the appeal, and court orders both at the circuit court and supreme court followed. None of the issues arising from those complications remain today. The Jones County Circuit Court affirmed the findings of the Commission on March 9, 1998. This appeal resulted.

DISCUSSION
¶ 15. We review the actions of the Workers' Compensation Commission with great deference. The Commission is the agency empowered to apply the statutory scheme created for workplace injuries, and within broad limits their view on the evidence is binding. Reversal is justified only when a commission order is not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law. Smith v. Jackson Const. Co., 607 So.2d 1119, 1124 (Miss. 1992).

I. Substantial evidence to support work-related permanent medical impairment
¶ 16. The commission found that Blackledge has a permanent medical impairment attributable to his coronary condition. The claimant's coronary artery disease and the associated blockage were found to be related to the stress of his employment as a firefighter.
¶ 17. A compensable workers' compensation injury is an "accidental injury or accidental death arising out of and in the course of employment without regard to fault which results from an untoward event or events, if contributed to or aggravated or accelerated by the employment in a significant manner." Miss.Code Ann. § 71-3-3(b) (Rev.1995) (emphasis added). The claimant has the burden of proving by a "fair preponderance of the evidence" that *577 an injury occurred that has a causal connection with the claimant's employment. Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 13 (Miss.1994). The claimant has an obligation to make out a prima facie case of disability, at which time the burden shifts to the employer. Id.
¶ 18. There was substantial evidence that, if believed by the Commission, indicated that job-related stress arisen from his normal duties worsened the claimant's medical condition. Dr. James Waites noted in a letter that predated Blackledge's first angioplasty, that the job the claimant worked was "stressful." Dr. Waites stated that he believed "the stress of his job did have a real contributing factor. He continues to be unable to work at this time and should be considered totally and permanently disabled." Dr. Thad Waites testified that Blackledge had a heart attack while on the job. There was medical testimony that Blackledge had a permanent injury. There was also evidence from competent and respected physicians that there was no job-relatedness.
¶ 19. It is the existence of substantial evidence to support the Commission, not the presence of reasonable rebuttal to it, that controls us in our review. Blackledge suffered a permanent medical impairment attributable to his coronary condition, a condition aggravated by on-the-job stress.

II. Evidence to support temporary total disability benefits
¶ 20. Blackledge was found to be entitled to temporary total disability benefits. The City argues that more weight should be given to the testimony of the two board-certified cardiologists, Dr. Webster and Dr. Thad Waites. This simply was a dispute among the medical experts. The Commission is the trier of facts, who must make decisions as to the credibility of witnesses. Its findings of fact supported by substantial evidence should be affirmed. Roberts v. Junior Food Mart, 308 So.2d 232, 233 (Miss.1975).

III. Evidence to support temporary partial disability benefits
¶ 21. The administrative judge found that Blackledge was temporarily partially disabled from December 1, 1992, the date he became a training officer, until he last worked at the fire department on May 3, 1994. The judge found that Blackledge actually was paid $63.80 less per month as a training officer than he would have been paid as a captain. Based on this finding, the administrative judge ordered that the claimant be paid temporary partial disability benefits at the rate of $25 per week from December 1, 1992, until May 3, 1994.
¶ 22. The City argues that Blackledge is not entitled to temporary total disability benefits. Blackledge stated that he took the job as a training officer because it was less stressful. He testified that in this job, he "wouldn't be involved with the physical part of fire fighting." Had he remained in the captain's position, he would have needed to leave the fire department because he was no longer physically able to perform that job.
¶ 23. We are aware that Blackledge elected to work as a training officer in order to remain on the force, but his wage statements, which were placed into evidence, reflect that he actually received more compensation for his employment as a training officer than he had in his previous jobs. He was paid $389.91 per week prior to January 1, 1991. From January 1, 1991, until December 1, 1992, Blackledge was paid an average weekly wage of $423.38. From December 1, 1992, until his retirement in May 1994, the claimant received an average weekly wage of $439.99.
¶ 24. Thus, the wage statements fail to reflect the loss in earning capacity that the $25 per week was designed to remedy. Consistent with our original decision in this case prior to rehearing, we find that the City is correct. We reverse and render as to this $25 per week payment.

*578 IV. Evidence to support a loss of wageearning capacity

¶ 25. The claimant was found to have an 80 percent loss of wage-earning capacity. The City argues that the medical evidence shows that Blackledge reached maximum medical improvement after the angioplasty on January 7, 1991. He then was able to return to work as a fire-fighter. Blackledge's wage statements reflect no loss of wages until he retired. However, the Commission was entitled to find that the claimant was forced to retire because of the physical disabilities caused by his medical condition, compounded by his employment. As noted by the administrative law judge:
Considering the nature and severity of claimant's work-connected impairment, his inability to return to his former occupation of 22 years and his incapacity to earn wages in other employment, among other industrially related factors such as his age, education and geographic location, this Administrative Judge finds he has an 80% loss of wage earning capacity attributable to his work activities as a firefighter.
¶ 26. This justifies a finding that the claimant suffers from a loss of wage-earning capacity.

V. Even assuming that Blackledge's coronary artery disease is job-related, a greater apportionment than one-half should be made because of his pre-existing heart disease.
¶ 27. In this court's initial decision, we found that any apportionment of disability payments because of a pre-existing heart condition was unwarranted. We reversed and rendered in favor of Blackledge. Raised with us on rehearing is that Blackledge did not cross appeal the issue of apportionment. We agree that in the absence of a cross-appeal, we should not address the propriety of any apportionment. Maupin v. Estate of Perry, 396 So.2d 613, 616 (Miss.1981). Therefore, we conclude that some apportionment is justified.
¶ 28. The issue raised by the City on appeal was whether the apportionment of only fifty percent was enough. In one precedent addressing the issue, the claimant had suffered a back injury and returned to work full time. Several years later, she was severely beaten while trying to prevent a shoplifting and developed psychological problems. Stuart's, Inc. v. Brown, 543 So.2d 649, 650 (Miss.1989). The employer argued that the workers' compensation benefits awarded the claimant should have been reduced because her earlier injuries contributed to her permanent disability. Id.
¶ 29. The court found as to the back injury that "a preexisting physical handicap, disease or lesion which did not impair wage earning capacity ex ante by definition cannot be that which impairs wage earning capacity ex post." Id. at 653. The court excepted occupational disease and heart attack cases from the rule. Its holding explicitly did not apply to "occupational disease or heart attack cases. Indeed, heart attack cases seem sui generis ...." Id. at 656 no. 13.
¶ 30. There was evidence that Blackledge suffered from coronary artery disease and that it likely predated the day of his injury. We have already found that there was substantial evidence that stress of being a fire-fighter aggravated his condition. The degree of impact of the coronary artery disease is a matter uniquely within the discretion of the Commission to resolve. If this appears to be little more than an unscientific splitting of responsibility evenly, we can only say that the apportionment perforce is unscientific. This was a highly stressful job, and the claimant had a highly dangerous heart disease. We find that the Commission's apportionment was within the range permitted by the evidence.
¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY IS *579 AFFIRMED IN ALL RESPECTS EXCEPT THAT WE REVERSE AND RENDER THE AWARD OF $25 PER WEEK TEMPORARY PARTIAL DISABILITY BENEFITS FROM DECEMBER 1, 1992, UNTIL MAY 3, 1994. ALL APPEAL COSTS ARE TAXED TO APPELLANTS.
McMILLIN, C.J., BRIDGES, IRVING, LEE, AND THOMAS, JJ., CONCUR.
PAYNE, J., CONCURS IN PART AND DISSENTS IN PART, WITH SEPARATE WRITTEN OPINION, JOINED BY KING, P.J. AND DIAZ, J.
MOORE, J., NOT PARTICIPATING.
PAYNE, J., concurring in part, dissenting in part:
¶ 32. Because I believe that the apportionment in this case was improper, I must respectfully dissent to Part V of the majority opinion. I disagree with the majority's determination that this issue is controlled by a procedural rule. The case relied on by the majority declined reviewing issues raised by the appellee "because they were not raised on direct appeal and the Appellee has filed no cross-appeal." Maupin v. Estate of Perry, 396 So.2d 613, 616 (Miss. 1981). It is true that Blackledge did not file a cross-appeal. However, the employer/carrier chose to place the issue of apportionment on the table in its direct appeal by seeking this Court's increase of the fifty percent apportionment imposed by the Commission. As such, I believe that the employer/carrier risked the possibility that apportionment would be decided adversely to them and reduced even though they argued the contrary position. "The appellate court has the duty to review the facts contained in the record, and to determine whether or not those facts substantiate the order of the Workers' Compensation Commission. The appellate review of facts shall determine whether or not the Commission was manifestly in error in its interpretation of those facts." Flake v. Randle Reed Trucking Co., et al., 458 So.2d 223, 224 (Miss.1984). Thus, in my view, the issue of apportionment was properly before the Court for our consideration in toto.
¶ 33. My disagreement with the procedural matter aside, I move to why I believe that the record was insufficient to support a fifty percent apportionment based on Blackledge's pre-existing cardiac malady. "The issue of apportionment, particularly in heart-injury cases, is a difficult task which can only be made on an ad hoc basis." Hardin's Bakeries v. Dependent of Harrell, 566 So.2d 1261, 1265 (Miss.1990). I fully appreciate the difficult situation in which the Commission found itself. While the Commission had adequate medical findings on which to determine that a pre-existing medical condition existed, there was insufficient evidence to support the apportioning of benefits at fifty percent.
¶ 34. The controlling case, in my view, is Mitchell Buick, Pontiac, & Equip., et al. v. Cash, 592 So.2d 978 (Miss.1991). In Cash, the injured worker suffered a heart attack at work, and the medical testimony revealed that he suffered from pulmonary disease and hypertension. Id. at 979. The supreme court, quoting Dunn's treatise on Mississippi Workers' Compensation law, held:
[A]pportionment becomes mandatory and is not to be denied because no scientifically objective apportionment of the causes in terms of degree is offered or available. Medical evidence as to the degree of contribution is not required and if given is not necessarily binding upon the Commission, but a `reasonable discretion' is to be exercised in this area based upon all of the circumstances and upon a fair view of all the facts.
Id. at 981 (quoting Dunn, Mississippi Workers' Compensation § 56 (3d ed.1982)). While there was some medical evidence that Blackledge suffered from a pre-existing heart disease, there was by no reasonable assessment enough medical evidence *580 for the Commission to apportion at fifty percent. The majority correctly assesses why the Commission, in my view, was arbitrary and capricious when they say that the difficult task of apportionment is not a scientific exercise. Since there is no apportionment formula, Commission decisions in this regard must be carefully reviewed as the absence of guidelines necessarily make apportionment decisions more susceptible to arbitrary and capricious results.
¶ 35. Concerning the consequences of working in the fire fighting field, Dr. James Waites noted in a letter that the job Blackledge worked in was a very "stressful" environment. As the facts reflect, Blackledge's job entailed driving a truck to the scene of fires, as well as ensuring that all personnel were properly attired in full protective clothing. His fire suit weighed fifty-six pounds, and he often had to exert energy in climbing fire ladders and using pick axes and chain saws in rescue efforts. This certainly cannot be characterized as a normal desk job.
¶ 36. On June 24, 1994, Dr. Waites wrote a letter stating, "[W]e feel like the stress of his [Blackledge's] job did have a real contributing factor. He continues to be unable to work at this time and should be considered totally and permanent disabled."
¶ 37. What I cannot ignore is the fact that Blackledge worked for the City of Laurel for over twenty years. He is now unable to work or procure any employment which would not put his life in danger. The employer takes his employee as he finds him. I would remand for further action by the Commission on the issue of apportionment.
KING, P.J., AND DIAZ, J., JOIN THIS SEPARATE WRITTEN OPINION.