MYERS, P.J.,
 

 for the Court:
 

 ¶ 1. At issue in this appeal is whether the Jackson County Circuit Court erred in affirming the decision of the Mississippi Workers’ Compensation Commission (Commission) which denied Raymond D. Langford’s claim for medical and disability benefits. Langford filed a petition to controvert on June 8, 2004, alleging that he sustained injury to his heart and lungs after exposure to toxic fumes at his place of employment on July 25, 2001. The ad
 
 *1268
 
 ministrative law judge (ALJ) determined that Langford had failed to prove that his lung and heart condition arose out of and in the course and scope of his employment with Southland Trucking Company. The Commission affirmed the ALJ’s finding. The circuit court, on appeal, held that the Commission’s decision was supported by substantial evidence and affirmed its ruling. Finding no error, we affirm the circuit court’s judgment.
 

 FACTS
 

 ¶ 2. Langford was employed as a truck driver for Southland, a cement trucking business in Jackson County, Mississippi. Langford’s job primarily involved hauling sand and gravel to area concrete plants. The drivers received extra pay for washing their company trucks on the weekends.
 
 [1]
 
 To assist the drivers in cleaning the chrome rims and fuel tanks on the trucks, the drivers used a cleaner called Crete Brite, which was stored at Southland’s sister company, Metro Concrete, located directly next to Southland.
 

 ¶ 3. Langford claimed that on the afternoon of Wednesday, July 25, 2001, he experienced an injurious exposure to toxic fumes when Kenneth Mitchell, a co-worker from Metro Concrete, assisted him in pouring Crete Brite from a 55-gallon drum into a small container for Langford to clean his cement truck that upcoming weekend. According to Langford, he held the container, which he described as a two-gallon square jug with a two to three inch opening on the top of it, while Mitchell poured the Crete Brite from the drum. Langford claimed that the 55-gallon drum was full at the time. During the transfer, some of the cleaner spilled onto Langford, and he inhaled the vapors.
 

 ¶ 4. In his deposition, Langford said that some of the Crete Brite “sloshed on [his] hands.” He described the Crete Brite as having an ammonia odor; he also said that he had never had any problems before with the cleaner after using
 
 it. When
 
 asked if any of the Crete Brite got on anything other than his hands, Langford said no. When asked if he had any reaction to his hands from the Crete Brite, Langford again said no. Langford stated that immediately following the incident, he placed the container in the back of his pickup truck, drove over to Southland, and placed the container inside the mechanic’s shop at a particular location where they could get to it later when they washed the company trucks. He then went inside the office, did his papeiwork for the day, and went home. He said that he took a shower, ate supper, watched TV, and went to bed.
 

 ¶ 5. When Langford later testified at the hearing before the ALJ, he reiterated that the 55-gallon barrel was full of Crete Brite at the time of the incident. Langford said that he had positioned himself squarely in front of the barrel and was holding the container while Mitchell tilted the barrel forward toward him to pour the Crete Brite. During the process, the barrel got away from Mitchell which caused some of the Crete Brite to spill out and resulted in Langford getting what he described as a “full blast of it.” He testified that the Crete Brite not only spilled on his hands, but also on his shirt. When asked if he had any burns on his hands or any other part of his body, Langford responded that he had “washed [his] hands and ... arms and everything off with water [as a] ... precaution.” He indicated that his hands
 
 *1269
 
 may have been blistered, but he could not remember.
 

 ¶ 6. Contrary to what he had stated in his deposition, Langford said that he did not thereafter take the container of Crete Brite back to Southland; instead, he took it home with him. Langford explained that he did so because the shop at South-land was already closed. He admitted that he probably was not permitted to take the Crete Brite home with him and should not have done so, but he claimed that he had no other place to put it, and they needed to wash their company trucks the next day.
 

 ¶ 7. The following morning when Lang-ford awoke at 2:00 a.m. to report to work at 3:00 a.m., he felt some shortness of breath, which he did not think much of at the time. He went to work and transported a load to Picayune, Mississippi. Upon his return, Langford told his employer he was not feeling well and was having trouble breathing. Langford went home and sometime later went to the emergency room at the Ocean Springs Hospital. There, he informed an emergency-room physician that he had inhaled some cleaning solution. Langford was admitted to intensive care and placed on oxygen.
 

 ¶ 8. While at the Ocean Springs Hospital, Langford was seen by Dr. Harry Heitzman, who specialized in internal medicine. Dr. Heitzman obtained consultations from Dr. Gary Rodberg, a pulmo-nologist, and Dr. Joseph Pedone, a cardiologist. Langford was treated under a preliminary diagnosis of possible chemical pneumonitis based on his admission history. The physicians were able to stabilize Langford’s condition well enough for him to go home. Langford was discharged on July 31, 2001, diagnosed with chemical pneumonitis and congestive heart failure, and he was instructed to follow up with his cardiologist, Dr. Pedone.
 
 [2]
 

 ¶ 9. On August 6, 2001, on the advice of Dr. Pedone, Langford went to the Singing River Hospital where he underwent a ear-diac catherization procedure. The procedure determined that Langford had “moderate to server aortic and mitral valve regurgitation, mild depression of left ventricular function, and 80 percent narrowing of [his] right coronary artery.” Dr. Pe-done recommended that Langford undergo both double-valve procedure surgery as well as single-vessel bypass surgery in September 2001.
 
 [3]
 

 ¶ 10. On August 15, 2001, Langford returned to the Singing River Hospital complaining of shortness of breath. He was admitted with a diagnosis of congestive heart failure, including “fever, hypotension, worsening respiratory failure requiring mechanical ventilator support, and acute renal failure.” By all accounts, Langford was in critical condition.
 

 ¶ 11. While at the Singing River Hospital, Langford was seen by Dr. Timothy Hiebert, a pulmonary specialist. Dr. Hie-bert recorded a patient history of fume exposure brought upon “while transferring [a] cleaner from a 55-gallon drum to a smaller container.” Dr. Hiebert opted to perform a biopsy on the lower lobe of Langford’s right lung. Tissue samples from that procedure were sent to Dr. James Waldron, a diagnostic surgical pa
 
 *1270
 
 thologist at the University of Arkansas for Medical Sciences. Dr. Waldron was informed that Langford “was a [fifty-two-] year[-]old male with aortic insufficiency and a one-month history of shortness of breath, initiated by inhalation of a clinical cleaner.” Upon examining the tissue samples, Dr. Waldron concluded that the “tissue showed acute lung injury, which would be classifiable as diffuse alveolar damage, organization phase, with elements of bron-chiolitis obliterans.” In Dr. Waldron’s opinion, based upon a reasonable degree of medical probability, the alveolar damage “was consistent with some sort of inhalation injury to the lungs.”
 

 ¶ 12. Langford underwent heart surgery in November 2001. According to Langford, he has not returned to his pre-injury condition. He continues to have shortness of breath with any type of physical exertion, and he has a “physician’s release” from Dr. Hiebert.
 

 ¶ 13. On June 8, 2004, Langford filed a petition to controvert with the Commission alleging that he had suffered a work-related accident as the result of exposure to toxic fumes which caused injuries to his lungs and heart. Southland and its insurance carrier filed an answer disputing Langford’s claim.
 

 ¶ 14. A hearing was held on or about May 17, 2007, before the ALJ. Both parties submitted extensive evidence to the ALJ for her consideration of the merits of Langford’s claim. Along with his testimony, Langford presented evidence composed of depositions and/or medical records from his treating and consulting physicians, Drs. Heitzman, Pedone, Rod-berg, Hiebert, and Waldron. Southland presented lay witness testimonies from Mitchell and from Tanya Philbrook, Southland’s bookkeeper during the period of time in which Langford was employed by Southland. In support of its claim that Langford did not sustain an injurious exposure to Crete Brite, Southland submitted expert opinions from Drs. Robert Jones, a professor of medicine at Tulane University, who is board certified in pulmonary diseases and internal medicine, and William George, a professor of pharmacology and toxicology at Tulane University. Southland also submitted the deposition of Dr. Robert Babcock, a chemical engineer, who is the department head of the Department of Chemical Engineering at the University of Arkansas.
 

 ¶ 15. Mitchell testified that when he assisted Langford in pouring the Crete Brite, the 55-gallon drum was about one-quarter to half full; he said that if the drum had been full he would not have been able to move it. Mitchell said that during the transfer, about a “quart or so” of the cleaner spilled onto the container and onto the concrete slab beneath it. He could not recall whether any of the cleaner had actually spilled onto Langford. Mitchell stated that he also periodically used the Crete Bite, and he did not recall any noticeable odor emanating from the cleaner. He testified that he was not aware of anyone who ever had any problems with the Crete Brite.
 

 ¶ 16. Philbrook testified that two days after the alleged incident, she went to the Ocean Springs Hospital to take Langford his paycheck. While Langford was in intensive care, Philbrook visited with Lang-ford’s wife and was told by her that Lang-ford was in the hospital because he had a reaction to the Crete Brite. During her visit, Philbrook learned that Langford was in possession of the Crete Brite. According to Philbrook, Langford was not supposed to have the cleaner in his personal possession. Philbrook said that Mrs. Langford informed her that the Crete Brite was in the back of Langford’s pickup truck, and she requested that it be removed. Philbrook removed the “jug” of
 
 *1271
 
 Crete Brite from Langford’s truck, placed it in the trunk of her car, and returned it to Metro Concrete. Philbrook testified that to her knowledge no one else at Metro Concrete or Southland had ever experienced any problems with the Crete Brite.
 

 ¶ 17. Dr. George reviewed the medical records for Langford from both the Ocean Springs Hospital and the Singing River Hospital, which contained Langford’s account of the incident. Dr. George also reviewed the material-safety data sheet for Crete Brite and researched the scientific literature on the effects of its chemical components. In September 2001, Dr. George submitted a report to Southland; in it, he explained that Crete Brite is an acid cleaner composed of ammonium bi-fluoride, butoxyethanol, hydrochloric acid, and hydrofluoric acid. According to Dr. George, inhalation could cause irritation to the tissues of the upper respiratory tract, coughing, nausea, chemical bronchitis, and difficulty breathing. Dr. George said that the expected effects of an acute dermal exposure include skin irritation, erythema, skin blanching, and skin blistering. With regal'd to Langford’s case, Dr. George opined as follows:
 

 Mr. Langford’s health complaints include shortness of breath, chemical pneumonitis, sepsis, congestive heart failure, Acute Respiratory Distress syndrome, renal failure, mitral[-]valve regurgitation and aortic regurgitation, the majority of which, would not appear to be causally related to any level of exposure to the components of Crete Brite. Specifically, sepsis, congestive heart failure, renal failure, mitral[-]valve regurgitation and aortic regurgitation are effects that would be unlikely to result from the above[-]described exposure to Crete Brite. These ai’e systemic effects, for which there is no causal mechanism or scientific basis for them to occur following localized irritant exposure, and consequently would not be expected to occur.
 

 On the other hand, chemical pneumonitis and shortness of breath could occur as a result of a significant exposure to the irritants found in Crete Brite.
 

 However, the brief outdoor exposure to Crete Brite, as described, would limit exposure levels, reducing the extent and likelihood of such effects. And, in fact, there was no evidence of lacrimation, eye irritation, nausea or vomiting occurring at the time of the exposure which is an indication that the exposure was minimal. Furthermore, Mr. Langford did not seek medical attention for at least 24-36 hours after this outdoor exposure of limited duration.
 

 [[Image here]]
 

 It is therefore my professional opinion, as a toxicologist, that these irritant effects which would have been the result of a localized and non-systemic exposure would resolve over a period of several days to weeks. And, if Mr. Langford is still experiencing shortness of breath, it is more likely the result of a significant smoking history, congestive heart failure and/or other preexisting heart conditions which were present long before the Crete Brite incident.
 

 ¶ 18. For his part, Dr. Jones also reviewed the medical records that were obtained from both the Ocean Springs Hospital and the Singing River Hospital; he also reviewed Dr. Waldron’s findings. Dr. Jones conducted his own research with regard to the Crete Brite and its chemical components.
 

 ¶ 19. In November 2001, Dr. Jones submitted his findings to Southland. Dr. Jones said that ammonium bifluoride is an acid solid, soluble in water, with a negligible vapor, and that Butyl cellosolve (2-butoxy ethanol) is an organic solvent that
 
 *1272
 
 is also water soluble, with a low-vapor pressure.
 

 ¶ 20. Dr. Jones explained that hydrogen chloride and hydrogen fluoride are gases, but when released into the air, they rapidly combine with water of relative humidity to form hydrochloric and hydrofluoric acids. According to Dr. Jones, “[w]hen put into dilute aqueous solution, as in the product Crete Brite, they do not off-gas in significant amounts at ambient temperatures. In other words, the Crete Brite doesn’t emit fumes.” Dr. Jones said that to inhale substantial quantities of Crete Brite’s ingredients, the cleaner “would have to be aerosolized as a fine mist or fog.” He added that “[i]f inhaled as an ordinary coarse or polydisperse aerosol, there will be more exposure to the eyes and upper respiratory tract than to the trachea, bronchi, and lungs.” Dr. Jones concluded as follows:
 

 Mr. Langford probably did not receive any bronchial or lung injury from Crete Brite. This is based on several lines of reasoning.
 

 First, it is unlikely that he had lower respiratory exposure:
 

 (1) The principal effects of a large exposure of moist surfaces — eyes, nose, mouth, throat, larynx — would be very severe inflammation of these tissues. The medical reports contain no observations indicating such injuries in Mr. Langford.
 

 (2) The effects of hydrofluoric and hydrochloric acid are not only severe, they are immediate. One could not have a substantial exposure without immediate burning of the contacted eye and upper respiratory tissues. A substantial exposure of the lower[~]respiratory tract would produce an instantly and unmistakably life-threatening injury, resulting in immediate hospitalization. This did not occur in the case of Mr. Langford.
 

 (3)The circumstances of the exposure described by Kenneth Mitchell would not have resulted in inhalation of an aerosol of Crete Brite. (I note that as yet there is no definitive exclusion of some exposure subsequent to the described incident, but neither would the ordinary application of Crete Brite by pump sprayer be likely to cause substantial lower[-]respiratory exposure.)
 

 Second, the illness of July 26-31 bears no distinctive feature of chemical pneu-monitis. The enthusiasm for that diagnosis rests entirely on an assumption of a toxic exposure. In light of the above, it is unlikely that any exposure occurred. If the treating physicians are asked to assume that no Crete Brite reached the lower[-]respiratory tract, they should have no trouble propounding alternative diagnoses. The illness could as likely have been heart failure, precipitated in a man with multiple serious heart conditions by the pneumonia that was manifest on the X-ray taken on July 31. That pneumonia was probably of infectious cause, as are the common pneumo-nias of ordinary life.
 

 Thirdly, the illness of August-September, which was clearly “ARDS” or acute respiratory distress syndrome, was delayed ... too long to be a likely result of an exposure on or about July 25, even assuming arguendo that one had occurred. ARDS is a syndrome of acute alveolar lung damage that has many causes, including infection and other causes of toxemia or shock. Chemical inhalation can cause ARDS, but the chemicals in Crete Brite would have done so within one or at most a few days of inhalation, not weeks later. [Dr. Wal-dron’s] report, that the lung pathology was “consistent with chemical injury,” should not be taken as indicating that the findings pointed specifically to inhalant injury among the many causes of
 
 *1273
 
 diffuse alveolar damage. The described changes are exactly those seen with any and all causes of ARDS. Again, absent an assumption of a toxic exposure to [sic] lung, the illness would likely be diagnosed as infectious in origin, although other possibilities exist.
 

 I thus conclude that there is no causal relationship between Crete Brite and any of Mr. Langford’s medical conditions.
 

 ¶ 21. In 2005, Dr. George conducted a test to determine the concentration of hydrogen fluoride and hydrogen chloride in the air resulting from the off-gassing of Crete Brite. The test allowed a fixed volume of the product to equilibrate for twenty-four hours in a closed chamber. According to Dr. George, the results of that test pi'oduced a level of hydrogen fluoride and hydrogen chloride of less than 0.5 parts per million (ppm). Dr. George stated that it was important to note that this test was conducted in an enclosed chamber over a twenty-four hour period, as compared to that of an exposure of limited duration and outdoors as in Langford’s case, where there would be dilution into the open air. Dr. George added that “the exposure levels were lower than 1/6 to 1/10 of the workplace permissible exposure levels (PELs), for hydrogen fluoride and hydrogen chloride, as determined by the Occupational Safety and Health Administration (OSHA), which he said are 3 ppm and 5 ppm, respectively.” He concluded that in his professional opinion, the levels of hydrogen fluoride and hydrogen chloride in the air at the time of Mr. Lang-ford’s reported exposure to Crete Brite, would have been insufficient to cause the injuries as claimed.
 

 ¶ 22. Dr. Babcock was provided partial depositions taken from both Mitchell and Langford. Dr. Babcock conducted a series of experiments in order to determine whether one could be subjected to vapors from hydrogen chloride and hydrogen fluoride at a hazardous level under the reported circumstances. Using hydrogen chloride and hydrogen fluoride monitors, Dr. Babcock tested 50 milliliters of Crete Brite in a fume hood for the gas concentration “in parts per million.” According to Dr. Babcock, the measured concentrations of hydrogen chloride and hydrogen fluoride “were very low, in the one-tenth, two-tenths parts per million.” In his professional opinion, based on a reasonable degree of scientific probability, the experiments established that representative of the circumstances under which the Crete Brite was being poured from a 55-gallon drum into a separate container, neither man was subjected to vapors of hydrogen chloride and hydrogen fluoride in excess of the permissible exposure limits.
 

 ¶ 23. During his deposition, Langford’s attorney asked Dr. Babcock whether his opinion would change if Langford had ingested a droplet of the cleaner. Dr. Bab-cock said that he could not imagine the sloshing action described by Langford in his deposition as “being enough to actually create a mist coming out of the smaller container and being breathed by [Lang-ford].” Dr. Babcock added, however, that if that did happen, it would increase the likelihood of a hazardous situation.
 

 ¶ 24. The ALJ found that Langford had failed to prove that his lung and heart condition for which he was hospitalized on numerous occasions, arose out of and in the course of his employment with South-land. Specifically, the ALJ found that Langford’s testimony was discredited by Philbrook and Mitchell, as well as the relevant medical records. She concluded Langford’s testimony concerning the cause of the of the injury was not credible, and on that basis alone, she denied his claim. The ALJ added, however, that Southland also provided persuasive expert testimony
 
 *1274
 
 as to why Langford did not sustain an injurious exposure to Crete Brite on July 25, 2001. The ALJ found that the expert testimony provided by Southland as to why Langford did not sustain an injurious exposure to Crete Brite on July 25, 2001, was persuasive. She noted their opinions were more probative, and the tests that were conducted were extremely detailed. With regard to Langford’s treating physicians, the ALJ found that their opinions appeared not to be based on a detailed accounting of the facts and were rendered in terms of possibilities, rather than probabilities, as required by the law.
 

 ¶ 25. Langford appealed the ALJ’s decision to the full Commission, which allowed for oral arguments. The Commission thereafter affirmed the ALJ’s decision. Langford appealed to circuit court; after concluding that the Commission’s decision was supported by substantial evidence, the circuit court affirmed Commission’s decision.
 

 ANALYSIS
 

 I. Applicable Standard of Review
 

 ¶ 26. Langford argues that he was not afforded a full, fair, and impartial review of the evidence and the application of the law on that evidence with regard to his workers’ compensation claim. He contends that the ALJ adopted, almost verbatim, the findings and conclusions of Southland’s “trial” brief for her opinion, which the Commission thereafter affirmed without written opinion. Langford asserts that even though the circuit court acknowledged as much on appeal, the circuit court nonetheless failed to perform the required examination of the record and merely accepted the conclusion of the Commission on a finding that its decision was supported by substantial evidence. Langford contends that the circuit court ignored the favorable evidence provided by his treating physicians and rested its decision solely on the evidence submitted by Southland.
 

 ¶ 27. Southland argues that what the ALJ requested, and what its counsel submitted, was a legal memorandum brief addressing the issue of causation, not a proposed order containing findings of fact and conclusions of law. Southland contends that the ALJ wrote her own decision and order after reviewing the respective positions of both parties. Southland maintains that the ALJ, having found the argument concerning the law and facts presented by its counsel to be more persuasive, simply utilized some of the language contained in its submitted brief in her decision and order.
 

 ¶28. In workers’ compensation cases, a decision by the Commission is afforded great deference. Facts determined by the Commission may not be disturbed on appeal to the judiciary when those facts are supported by substantial credible evidence.
 
 Raytheon Aerospace Support Servs. v. Miller,
 
 861 So.2d 330, 335 (¶ 11) (Miss.2003) (citations omitted). On appeal, we apply the “arbitrary and capricious” standard of review with regard to factual questions.
 
 Bynum v. Anderson Tully Lumber Co.,
 
 996 So.2d 814, 817 (¶ 11) (Miss.Ct.App.2008). Even if this Court, as the fact-finder, would have reached the opposite conclusion, we may only interfere when the Commission’s factual findings are found to be unsupported by substantial evidence or found to be arbitrary and capricious.
 
 Clark v. Spherion Corp.,
 
 11 So.3d 774, 777 (¶ 13) (Miss.Ct.App.2009) (citations omitted). “Where the decision of the Commission is supported by substantial evidence, there can be no finding of arbitrariness and caprice.”
 
 Richardson v. Johnson Elec. Auto., Inc.,
 
 962 So.2d 146, 150 (¶ 10) (Miss.Ct.App.2007) (citing
 
 Miller,
 
 861 So.2d at 335 (¶ 9)). Substantial evidence, though not easily de
 
 *1275
 
 fined, can be said to mean “such relevant evidence as reasonable minds might accept as adequate to support a conclusion.”
 
 Delta CMI v. Speck,
 
 586 So.2d 768, 778 (Miss.1991) (citations omitted). Substantial evidence is more than a “mere scintilla” of evidence that does not rise to the level of a preponderance of the evidence; it affords “a substantial basis of fact from which the fact in issue can be reasonably inferred.”
 
 Id.
 
 With regard to matters of law, we will not interfere with the Commission’s application thereof unless it is found to be clearly erroneous.
 
 Duke ex rel. Duke v. Parker Hannifin Corp.,
 
 925 So.2d 893, 896 (¶ 11) (Miss.Ct.App.2005). As with all questions of law, our standard of review is de novo.
 
 Harrison County v. City of Gulfport,
 
 557 So.2d 780, 784 (Miss.1990).
 

 ¶ 29. In workers’ compensation cases, the circuit courts act as intermediate appellate courts and, thus, review the Commission’s decisions under the aforesaid standard of review.
 
 Delta CMI,
 
 586 So.2d at 773. Subsequent appeals to the supreme court are technically from the decision of the circuit court; however, for all practical purposes, the decision of the Commission is that which actually is under review.
 
 Id.
 

 ¶ 30. In the instant case, the circuit court opined as follows with regard to the proper standard of review:
 

 Langford argues on appeal that [the normal] deferential standard of review is not warranted here since the ALJ adopted, almost verbatim, the findings and arguments set forth in Southland Trucking’s trial brief submitted prior to the hearing on May 17, 2007. In such circumstances, it is necessary to view with a more critical eye to insure that the Commission has adequately performed its function.
 
 Omnibank of Mantee v. United Southern Bank,
 
 607 So.2d 76, 82-83 (Miss.1992);
 
 Greenwood Utilities v. Williams,
 
 801 So.2d 783[, 787-88 (¶ 10)] (Miss.Ct.App.2001). While the deferential standard is lessened, it is not de novo.
 
 Rice Researchers, Inc., v. Hiter,
 
 512 So.2d 1259, 1265 (Miss.1987). With these considerations in mind this Court has thoroughly examined the record in this matter and, even utilizing a relaxed standard of review, there exists on the whole substantial evidence supporting the Commission’s findings of fact and decision in this case.
 

 ... The conclusion of the ALJ and the Commission that Langford failed to satisfy his burden of proof, that his injury and condition arose out of and in the course of his employment, is supported by substantial evidence and therefore must be affirmed.
 

 ¶ 31. Langford contends that the problem with the circuit court’s application of the standard of review is that the court relied upon case law which failed to consider that, in essence, the ALJ’s opinion was nothing more than Southland’s brief. We disagree.
 

 ¶ 32. In
 
 Greenwood Utilities v. Williams,
 
 801 So.2d 783, 787-88 (¶10) (Miss.Ct.App.2001), which the circuit court in this case cited to for authority, the ALJ similarly requested briefs from the parties, which this Court equated to inviting proposed orders.
 
 Id.
 
 Seeing no practical difference between the two measures, the
 
 Williams
 
 Court explained that: “The Commission, as the ultimate finder of fact, is akin to a trial judge sitting without a jury.”
 
 See id.
 
 at 788 (¶ 14). As in situations where the trial judge merely adopts the proposed findings of fact and conclusions of law of a litigant, the usual appellate deference afforded to the Commission is lessened when there is convincing evidence that the ALJ has adopted all the proposed findings of a party verbatim, and the Commission affirms without opinion.
 
 Id.
 
 at (¶¶ 13-15) (citing
 
 Omnibank of Man-
 
 
 *1276
 

 tee,
 
 607 So.2d at 82-88). In such instances, this Court “must view the challenged findings of fact and the appellate record as a whole with a more critical eye to insure that the Commission has adequately performed its function.”
 
 Id.
 
 at (¶ 15) (quoting
 
 Omnibank of Mantee,
 
 607 So.2d at 83).
 

 ¶ 33. Here, having compared South-land’s trial brief with the ALJ’s order and opinion, we agree with Southland that the portion of the ALJ’s opinion utilizing language from its brief is limited solely to the issue of causation. However, this was the core issue of the case, and it comprised the crux of the ALJ’s opinion. With the exception of a few words or sentences at various places, the ALJ’s order finding that Langford had failed to prove the occurrence of an accidental injury arising out of and in the course of employment is substantially verbatim to what is stated in Southland’s trial brief.
 

 ¶ 34. As was noted in
 
 Greenwood,
 
 we may not dismiss these findings out of hand. Id. While not the same as findings independently made by an administrative law judge after “impartially and judiciously sifting through the conflicts and nuances” of the evidence, they are entitled to deference. Hiter; 512 So.2d at 1265. Fundamentally, it is not the role of the appellate courts to probe the thought processes behind the decisions made by the finder of fact.
 
 Kitchens v. Jerry Vowell Logging,
 
 874 So.2d 456, 461 (¶ 13) (Miss.Ct.App.2004). Pragmatically, as our supreme court has commented, the overwhelming case loads facing our trial judges and administrative judges alike, with the intricate complexities that often accompany each, may “necessitate substantial reliance upon the submissions of trial counsel.” Hi
 
 ter,
 
 512 So.2d at 1266.
 

 ¶ 35. Accordingly, we find no error with the circuit court’s refusal to review the Commission’s decision de novo. However, because the ALJ in this matter did not give any instruction at the conclusion of the hearing as to her views on the facts in evidence before incorporating Southland’s trial brief into her final decision and order, it warrants at least a critical look by this Court in our review of the record in this case.
 
 Greenwood,
 
 801 So.2d at 788 (¶ 15).
 

 II. Commission’s Decision
 

 ¶36. Langford argues that the ALJ’s credibility determination was arbitrary and capricious, and her evaluation of the medical evidence runs contrary to the record and is not supported by applicable law. Langford contends that by relying on Southland’s findings of fact and conclusions of law, the ALJ accepted Southland’s attempted assertion that he was procuring the Crete Brite for his own personal use when the incident occurred on July 25, 2001 — -an allegation which Langford maintains is based on innuendo and conjecture. Langford further contends that by unfairly discrediting all of his testimony as unreliable, the ALJ and ultimately the Commission failed to properly evaluate the evidence he submitted through his treating physicians under the deference afforded to him under the Mississippi Workers’ Compensation Law (“the Act”).
 

 II37. “A compensable workers compensation injury is an ‘accidental injury or accidental death arising out of and in the course of employment without regard to fault which results from an untoward event or events, if contributed to or aggravated or accelerated by the employment in a significant manner.’ ”
 
 City of Laurel v. Blackledge,
 
 755 So.2d 573, 577-78 (¶ 17) (Miss.Ct.App.2000) (quoting Miss.Code Ann. § 71-3-3(b) (Rev.2000)). The Act places with the claimant “the burden of proving by a ‘fair preponderance of the evidence’ that an injury occurred that has a causal connection with the claimant’s em
 
 *1277
 
 ployment.”
 
 Id.
 
 (citing
 
 Hedge v. Leggett & Platt, Inc.,
 
 641 So.2d 9, 13 (Miss.1994)).
 

 ¶ 38. As previously mentioned, we defer to the findings of the Commission so long as those findings are supported by substantial evidence. As the finder and trier of fact, it ultimately is the responsibility of the Commission to determine the credibility of the witnesses “and, when conflicts in credible evidence arise, to determine where the preponderance of the evidence lies.”
 
 Richardson,
 
 962 So.2d at 152 (¶ 16).
 

 ¶ 39. At the outset, we note that much is made in this case regarding Langford’s alleged purpose for obtaining the Crete Brite. Langford maintained throughout the case that he had obtained the Crete Brite for the purpose of washing his company truck that weekend. Southland, however, made an effort to show that Langford had procured the Crete Brite for personal reasons. Although Southland stipulated prior to the hearing that Lang-ford and another driver routinely washed their company trucks on the weekends, it is clear that Southland did not intend for the stipulation to be given any effect beyond that fact alone. Because the evidence demonstrated that Langford, without permission, had taken the Crete Brite home with him, Southland attempted to establish that he was acting outside the course and scope of his employment.
 

 ¶ 40. Had Southland proved as much, Langford of course would not be covered under the Act. The problem we find, however, is that the ALJ did not explicitly find this to be the case in her order; rather, she found that Langford’s testimony was discredited by Philbrook, Mitchell, and the relevant medical evidence and concluded that his testimony concerning the cause of the injury was not credible. We do not discount the significance of the fact that Langford had taken the container full of Crete Brite home with him following the incident, particularly, when Langford initially claimed that he had dropped the container off at the mechanic’s shop at Southland before going home. Certainly, contradictory or negative testimony concerning the cause of injury may be substantial evidence upon which a claim may be denied.
 
 Westmoreland v. Landmark Furniture, Inc.,
 
 752 So.2d 444, 449 (¶ 15) (Miss.Ct.App.1999). But, it is not clear to us that the ALJ actually concluded that Langford was acting outside the course and scope of his employment. The majority of ALJ’s opinion deals primarily with the credibility of the medical evidence, and the Commission affirmed the ALJ’s decision without written opinion.
 

 ¶ 41. When looking at the record as a whole, we cannot say that the evidence sufficiently establishes one way or the other Langford’s purpose for obtaining the Crete Brite. Despite the intricate discrepancies that were found to exist between Langford’s and Mitchell’s version of events concerning the incident, an incident involving the Crete Brite did indeed occur. And despite Langford’s conflicting statements as to what occurred following the incident, Langford’s explanation for having obtained the cleaner remained fairly consistent throughout the case. Therefore, with no express indication by either the ALJ or the Commission that Langford was acting outside the course and scope of his employment, we think it necessary in this instance for us to presume that Langford was acting in a manner so contemplated by the Act.
 

 ¶ 42. This, however, does not end our review. In order to receive benefits under the Act, Langford also was required to demonstrate that the alleged injury he sustained was causally related to his employment.
 
 Blackledge,
 
 755 So.2d at 577-78 (¶ 17). On this issue, the ALJ found that the medical and scientific evidence submit
 
 *1278
 
 ted by Southland’s experts was more credible than that provided by Langford. She, thus, concluded that Langford failed to prove that his lung and heart condition was causally related to his employment with Southland, which the Commission affirmed. Based on our review of the record, we find sufficient evidence to support the Commission’s decision.
 

 ¶ 43. Langford contends that the Commission’s evaluation of the medical evidence does not follow precedent, which he contends favors evidence provided by treating physicians. He cites to a number of cases for the proposition that a treating physician’s opinion is entitled to more weight than non-treating medical experts hired for trial purposes. For example, in
 
 Department of Health/Ellisville State School v. Stinson,
 
 988 So.2d 933, 934 (¶ 12) (Miss.Ct.App.2008), this Court stated: “We take note that a treating physician’s opinion is entitled to more weight than a physician who examines the individual solely for the purpose of testifying.” (Citation omitted). In
 
 Hinds County Board of Supervisors v. Johnson,
 
 977 So.2d 1193, 1198 (¶ 14) (Miss.Ct.App.2007), we upheld the ALJ’s legal finding which stated that “our case law permits courts and administrative judges to favor the testimony of treating physicians.” Similarly, in
 
 Cooper Tire & Rubber Co. v. Harris,
 
 837 So.2d 789, 792-93 (¶ 11) (Miss.Ct.App.2003), we held as follows:
 

 The medical evidence is not wholly conclusive; however, [John] Harris is only required to prove his case by a preponderance of the evidence. Our case law permits courts to favor the testimony of treating physicians.
 
 South Central Bell Telephone Co. v. Aden,
 
 474 So.2d 584, 593 (Miss.1985). Dr. [Keith] Mansel’s testimony that smoking would not cause the fibrotic scarring that led to Harris’s pneumonia was uncontested. We find that the Commission’s finding of a com-pensable injury is supported by substantial evidence.
 

 ¶ 44. As we explained in
 
 Richardson,
 
 962 So.2d at 152 (¶ 16), an opinion provided by a claimant’s treating physician is, undoubtedly, “of great import[.]” As such, the Commission is entitled to favor such testimony.
 
 Id.
 
 at 151 (¶ 12) (citing
 
 Mueller Copper Tube Co., Inc. v. Upton,
 
 930 So.2d 428, 437 (¶35) (Miss.Ct.App.2005)). However, the law does not “require” that the Commission “must” do so; rather, the law permits that it “may” do so within its “responsibility under our law for weighing and evaluating ... all ... testimony before it and making a finding.”
 
 Id.
 
 at 150-51 (¶¶ 11-12) (citation omitted).
 

 ¶ 45. According to the record, Dr. Heitzman testified that while at the Ocean Springs Hospital, Langford had what he felt was, based on a reasonable degree of medical probability, chemical pneumonitis. Dr. Heitzman stated that “during the course of the emergency[-]room evaluation, [Langford] had a little bit of a low oxygen saturation and required use of supplemental oxygen[;][h]e also was wheezing and subjectively short of breath with frequent dry, hacking cough.” Dr. Heitzman indicated that there was nothing about Lang-ford’s presentation at the hospital that gave him any reason to believe that Lang-ford “was manifesting anything other than somebody who was having trouble breathing.” Dr. Heitzman explained that Lang-ford already had preexistent valvular heart disease, which “the additional stress of hypoxia from an acute inhalation injury would have made worse and possibly (sic) have pitched him into an element of congestive heart failure.” As the ALJ noted, this diagnosis was developed from Lang-ford’s admission history taken by an emergency-room physician, who recorded that Langford had been exposed to a caustic solution called “Ever Brite.” Dr. Heitz-
 
 *1279
 
 man said that he could not fully speak to the exact occurrences of how Langford was exposed other than what was presented by Langford in his clinical condition. According to Dr. Heitzman, Langford’s discharge summary indicated that Lang-ford had been holding a can of cleaner, when some of the cleaner got on his hand, and he inhaled vapors from the solution.
 

 ¶ 46. On cross-examination, Dr. Heitz-man stated that he was not a toxicologist and admitted that he was not familiar with the contents of this particular commercial product, although he said that he had learned from Langford’s medical records that “Ever Brite” contains hydrofluoric acid, which he knows to be a “very caustic substance.” When told that Crete Brite contains both hydrofluoric acid and hydrochloric acid, Dr. Heitzman agreed that in order for either of these two acids to be inhaled they “would have to be in the form of gas, vapor or some sort of aerosol, which would be a combination of gas and fluid in suspension.” He opined that he thought it was possible “you [could] get aerosol” in the process of shaking up a barrel or with splashing, while pouring one liquid into another. Dr. Heitzman also acknowledged that he found no indication of any type of pathology in Langford’s upper respiratory tract or around his mouth, nose, or eyes.
 

 ¶ 47. Dr. Hiebert, the pulmonary specialist who examined Langford at the Singing River Hospital, testified that Langford reported to him that he had been exposed to a cleaner called Crete Brite while transferring it from one container to another. In his opinion, Dr. Hiebert felt that the “ammonia/acid chemical exposure caused hypoxemia,” and that this contributed to a low oxygen saturation condition which likely caused deterioration in Langford’s cardiac function. Dr. Hiebert indicated that his assessment was based primarily on Dr. Waldron’s pathology report in which he noted that the lung injury was consistent with an inhalation injury, and which Dr. Hiebert believed was the result of “fume exposure.”
 

 ¶ 48. On cross-examination, Dr. Hiebert indicated that he did not know much about the components of Crete Brite. The ALJ noted that when Dr. Hiebert was asked to assume that the concentration of the acid in Crete Brite was insufficient at ambient temperatures and pressures to cause vaporization of the acids, whether Langford could have possibly had an injurious exposure from either hydrochloric or hydrofluoric acid, he expressly stated that he did not know the answer.
 

 ¶49. The ALJ found Dr. Waldron’s opinion lacking because he did not know the nature of the chemicals that Langford was exposed to; thus, he did not know how the chemical inhalation may have occurred. Dr. Waldron explained that the “diffuse alveolar damage pathology” he interpreted from the slides he was sent is “just a pattern of lung injury.” He added that one can see that pattern of lung injury in a wide variety of circumstances. Dr. Waldron said that he concluded that the pattern was consistent with some sort of inhalation injury based on Langford’s admission history, which was relayed to him by one of Langford’s treating physicians. He added that he “wouldn’t have indicated that without the history.” The ALJ noted also that Dr. Waldron only analyzed the biopsy that was performed on Langford’s right lower lung, and that he did not analyze whether Langford had a topical injury.
 

 ¶ 50. With respect to Dr. Pedone’s testimony, the ALJ noted that Dr. Pedone saw Langford one year prior to the incident in question with the Crete Brite, and at that time, Dr. Pedone believed Lang-ford “had mild moderate valve disease, which did not warrant surgery at that
 
 *1280
 
 time.” At the time of Langford’s visit to the Ocean Springs Hospital on July 27, 2001, “Dr. Pedone was of the opinion that Langford had multi[-]valvular heart disease involving the aortic valve, as well as a high[-]grade blockage in the mid portion of his right coronary artery.” He recommended that Langford “undergo a double valve procedure surgery and coronary bypass surgery.” Dr. Pedone stated that in his opinion the blockage of Langford’s coronary artery was not aggravated by his lung problem. But, in regard to Lang-ford’s valve problem, Dr. Pedone “stated that it was ‘possible beyond a reasonable doubt’ or ‘that’s not impossible’ that the lung problem could worsen the preexisting valve problem.” The ALJ noted that this assessment was based on possibilities, rather than probabilities. When asked on cross-examination whether he had “sufficient medical facts on which to render an opinion to a reasonable degree of medical certainty as to whether the claimant suffered an injurious exposure to any chemicals” in July 2001, Dr. Pedone’s response was that “the main evidence he was hanging his hat on was the lung biopsy.” Dr. Pedone also acknowledged that he did not know which chemicals Langford was exposed to and admitted there are other possible causes that could mimic the biopsy finding. When asked whether there was any way that Langford could have sustained an injurious exposure by inhalation of fumes assuming that Crete Brite does not “off-gas” any harmful chemical, Dr. Pedone responded: “Assuming that it doesn’t off-gas at ambient temperature, you would have to doubt that.”
 

 ¶ 51. Lastly, with regard to Dr. Rod-berg’s consultation, the ALJ found that his diagnosis included the “impression’ of ‘Ever Brite topical and inhalation exposure with possible chemical pneumonisitis (sic), doubt infectious etiology.’ ” The ALJ noted that this opinion was based on a possible diagnosis as opposed to a probable diagnosis.
 

 ¶ 52. Based on our review of the record, the ALJ’s finding that Langford’s medical experts were unable to ascertain to a reasonable degree of medical probability that Langford’s lung and heart problems were the result of his having been exposed to the Crete Brite is supported by sufficient evidence. A claimant must prove that he or she suffered an occupational disease as a result of his or her employment by credible medical evidence rather than by mere speculation.
 
 Hensarling v. Casablanca Const. Co., Inc.,
 
 906 So.2d 874, 878 (¶ 16) (Miss.Ct.App.2005). Further, the record demonstrates that Langford provided inconsistent accounts with regard to the incident itself. In his deposition, Langford stated that cleaner spilled only on his hands. But, in his testimony at the hearing, Langford said that the cleaner spilled both on his hands and his shirt. Also, Langford claimed at the hearing that, as a precaution, he washed the Crete Brite off with water immediately following the accident. However, Langford made no mention in his deposition of ever washing his hands, and he indicated that he did not think much about the encounter with the Crete Brite at the time. While Mitchell could not recall whether any of the Crete Brite actually spilled onto Langford’s person, he corroborated what Langford attested, which was that immediately following the incident, Langford placed the container in the back of his pickup truck and left Metro Concrete’s yard. As the finder and trier of fact, such discrepancies are for the Commission to contend with.
 
 Westmoreland,
 
 752 So.2d at 449 (¶ 15). Accordingly, we reject the notion asserted by Langford on appeal that the ALJ failed to take into consideration that he may have ingested
 
 *1281
 
 some droplets of the Crete Brite during the incident.
 

 ¶ 53. Southland, on the other hand, submitted uncontroverted, credible medical and scientific evidence explaining why Langford did not sustain an injurious exposure to Crete Brite under the reported circumstances. Therefore, we find that the Commission’s decision to deny Lang-ford’s claim is supported by credible substantial evidence. Thei'efore, we affirm the judgment of the circuit court.
 

 ¶ 54. THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Southland stipulated at the outset of the hearing that if called to testify, Richard Townsend, another driver who worked for South-land, would corroborate Langford's testimony that they routinely washed their company vehicles every weekend and were so compensated by the company in the amount of $40.
 

 [2]
 

 . Prior to his employment with Southland, Dr. Pedone had diagnosed Langford as having a defective heart valve. According to Lang-ford, he began working for Southland in May 2001, and had stopped smoking approximately a year prior to this date. Langford did not know of his heart-valve condition until his Department of Transportation (DOT) physical.
 

 [3]
 

 . Dr. Pedone testified that in his opinion the blockage of Langford’s coronary artery was not aggravated by his lung problem. However, Dr. Pedone said that it was “possible beyond a reasonable doubt” that Langford’s pre-existing valve problem could have been worsened by his lung problem.